JUDGE JONES

12 CV 3558

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
LINDA SCOTT, on Behalf of and as
Parent and Guardian of C.S., a student
with a disability,

                       Plaintiff,

              - against -

NEW YORK CITY DEPARTMENT
OF EDUCATION,

                   Defendant.
-----------------------------------------------------X

**COMPLAINT**

**Civil Action No.**

**ECF Case**

## PRELIMINARY STATEMENT

1.    This action is authorized by the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), to review a final administrative decision of the New York State Review Officer ("SRO") regarding the provision of a free appropriate public education ("FAPE") to C.S., a minor student with a disability.

2.    Plaintiff Linda Scott seeks reversal of a decision rendered by the SRO on January 5, 2012, which denied Ms. Scott tuition funding for C.S.'s placement at the Cooke Center Academy, a private school for students with disabilities, for the 2010–2011 school year.

3.    This action is timely commenced within four months after the date of the SRO decision pursuant to 20 U.S.C. § 1415(i)(2)(B) and New York Education Law § 4404(3)(a).

## JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C. § 1415(i)(2)(A), and 28 U.S.C. § 1331, conferring jurisdiction in cases arising under the Constitution and laws of the United States.

5.      The Court has supplemental jurisdiction to adjudicate state claims arising out of the same facts as the asserted federal claims.  28 U.S.C. § 1367.

6.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) as the judicial district in which defendant New York City Department of Education ("DOE") has its principal offices.

## PARTIES

7.      Plaintiff Linda Scott is the mother of C.S., a minor.

8.      C.S. was born in 1994 and is currently seventeen years old.

9.      Ms. Scott and C.S. reside together in Brooklyn, New York.

10.     Defendant DOE is a municipal corporation whose principal offices are located at 52 Chambers Street, New York, New York 10007.

11.     The DOE is responsible under the IDEA and the New York State Education Law for providing a FAPE to New York City residents between the ages of three and twenty-one who have been classified as students with disabilities in need of special education services and who have not yet received a high school diploma.

12.     C.S. is identified by his initials in the caption of this action and throughout the Complaint consistent with Federal Rule of Civil Procedure 5.2(a).

## LEGAL FRAMEWORK

13.     In enacting the IDEA, Congress created a comprehensive statutory framework for "ensur[ing] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

14. States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and must ensure that all children with disabilities are afforded a FAPE. § 1412(a).

15. In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits," Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982), and provided in the least restrictive environment that meets the child's educational needs, § 1412(a)(5)(A).

16. School districts must have an Individualized Education Program ("IEP") in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually. §§ 1414(d)(2)(A), (d)(4)(A)(i).

17. The IDEA further mandates that school districts reevaluate each student with a disability at least once every three years, unless the parent and the school district agree otherwise. 20 U.S.C. §§ 1414(a)(2)(B)(ii).

18. Evaluations must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). School districts must assess students "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4).

19. In addition, school districts are required by the IDEA and New York State law to conduct age-appropriate assessments to support students in preparing to transition from school to post-school activities. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) (requiring that "beginning not

later than the first IEP to be in effect when the child is 16, and updated annually thereafter," an IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills"); 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (requiring school districts to ensure that students who have reached age twelve "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests").

**Due Process Procedures**

20.     The IDEA provides "procedural safeguards that enable parents and students to challenge the local educational agency's decisions," Murphy v. Arlington Cent. Sch. Dist., 297 F.3d 195, 197 (2d Cir. 2002) (citing 20 U.S.C. § 1415), including the right to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," § 1415(b)(6)(A).

21.     In New York, IDEA due process complaints initially must be litigated in a hearing conducted at the school district level before an Impartial Hearing Officer ("IHO").  N.Y. Educ. L. § 4404(1); 8 N.Y.C.R.R. § 200.5(i)–(j).

22.     New York State law places the burden of proof in impartial hearings on school districts, "including the burden of persuasion and burden of production," "except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Educ. L. § 4404(1)(c).

23.     "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies -- (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits."    20 U.S.C. § 1415(f)(3)(E)(ii)(I–III).    Subject to this provision, the decision of an IHO "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." § 1415(f)(3)(E)(i).

24.     The decisions reached in impartial hearings are subject to administrative appeals to the SRO. 34 C.F.R. § 300.514(b); N.Y. Educ. L. § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

25.     Those portions of an IHO's decision not appealed by either party are final and binding, and may not be reviewed by the SRO.  See 34 C.F.R. § 300.514(a); 8 N.Y.C.R.R. § 200.5(j)(5)(v).

26.     Once administrative remedies have been exhausted, either party may seek independent judicial review of the SRO's decision in the state or federal courts.  20 U.S.C. § 1415(i)(2)(A).

27.     In an appeal to the federal district court under § 1415(i)(2)(A), the court receives the record of the administrative proceedings and may accept additional evidence at the request of either party. § 1415(i)(2)(C).

28.     The district court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'"  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir.1997)).

29.     The court gives "due weight" to administrative rulings based on educational policy. Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).

30.     The court does not accord "due weight" when there are no administrative findings on an issue, Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ., 550 F. Supp. 2d 420, 432 (S.D.N.Y. 2008), or when determining questions of law, Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005).

**Tuition Payment Remedy**

31.     The IDEA grants courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

32.     In School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985), the Supreme Court interpreted this statutory provision to "confer[] broad discretion on the court" to grant relief that is "'appropriate' in light of the purpose of the Act," id. at 369, including an award of tuition reimbursement to parents where (1) the services offered by the school district are inadequate or inappropriate; (2) the private school selected by the parents is an appropriate placement for the student; and (3) equitable considerations support the parent's claim (the three "Burlington prongs"), id. at 369–70, 374; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12, 16 (1993).

33.     The 1997 and 2004 reauthorizations of the IDEA include a tuition reimbursement provision stating: "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate

public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii); IDEA Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37, 63 (1997).

34.     The IDEA provides that a reimbursement award "may be reduced or denied," § 1412(a)(10)(C)(iii), if: (1) "at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense," § 1412(a)(10)(C)(iii)(I)(aa), or (2) "10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency" of the foregoing information, § 1412(a)(10)(C)(iii)(I)(bb).

**Direct Tuition Payment**

35.     The Supreme Court has held that § 1412(a)(10)(C)(ii) is "best read as elucidative rather than exhaustive" with respect to the tuition remedies available under the IDEA, Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2493 (2009), and that the equitable power of courts under § 1415(i)(2)(C)(iii) is independent of, and broader than, the specific tuition reimbursement provision in the Act, id. at 2494–95.

36.     Relying upon this analysis, this Court has held that the IDEA authorizes an award of retroactive tuition payment directly to a private school where the three Burlington prongs are satisfied, the "parents lack the financial resources to 'front' the costs of private school tuition, and . . . a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs." Mr. and Mrs. A. ex rel. D.A. v. New York City Dep't of Educ., 769 F. Supp. 2d 403, 428 (S.D.N.Y. 2011).

# FACTS

## C.S.'s Disability

37.   C.S. is a seventeen-year-old student with a disability.

38.   The DOE's Committee on Special Education ("CSE") has classified C.S.'s disability as Autism.

39.   C.S. exhibits impaired cognitive functioning, delays in receptive and expressive language skills, difficulties with social communication, and academic functioning far below age and grade level.

40.   Notwithstanding these limitations, C.S. has a strong interest in academics and can participate actively in the classroom environment and make meaningful academic progress when provided with appropriate support.

## C.S.'s Educational History

41.   C.S. has been classified as a student with a disability by the CSE since he was in Kindergarten.

42.   C.S. attended DOE public schools from Kindergarten through the end of junior high school.  He received special education services throughout that period of time.

43.   In September 2008, C.S. began attending the Cooke Center Academy, a private special education high school located in Manhattan.

44.   The Cooke Center Academy is part of the Cooke Center for Learning and Development, a not-for-profit corporation.

45.   The DOE paid for the cost of C.S.'s attendance at the Cooke Center Academy for the 2008–2009 and 2009–2010 school years.

**The 2010–2011 School Year**

**Evaluations**

46.     In October 2009, in preparation for C.S.'s 2010–2011 IEP review, Ms. Scott provided the CSE with written authorization to conduct all necessary evaluations for C.S.

47.     At that time, C.S.'s last triennial evaluation had been conducted in January 2008.

48.     The assessments conducted as part of the January 2008 triennial evaluation were a psychoeducational evaluation, a Vineland-II Parent/Caregiver Rating Report ("Vineland-II Report"), and a classroom observation.

49.     As part of the January 2008 psychoeducational evaluation, C.S.'s cognitive functioning was assessed utilizing the Wechsler Intelligence Scale for Children – IV ("WISC-IV"). C.S. achieved a WISC-IV full-scale IQ score of 56, placing him in the Extremely Low range of cognitive functioning.

50.     The January 2008 psychoeducational evaluation report did not set forth an analysis of the nature of C.S.'s disability or his special education needs.

51.     The January 2008 Vineland-II Report was prepared based on an interview with an individual named Maria Vitiello, whose relationship to C.S. was identified as "Other."

52.     The January 2008 Vineland-II Report stated that C.S. was functioning at a Moderately Low level in the domains of Communication, Daily Living Skills, Socialization, and Motor Skills, with an Adaptive Behavior Composite also in the Moderately Low range.

53.     The January 2008 Vineland-II Report did not set forth an analysis of how C.S.'s adaptive functioning impairments affected his educational functioning or what interventions C.S. needed to address those impairments.

54.    The DOE evaluator who prepared the Vineland-II Report stated that she could not determine whether C.S. meets the diagnostic criteria for mental retardation because no IQ score had been reported to her.

55.    The 2008 triennial evaluation did not include a speech-language evaluation.

56.    At the time Ms. Scott signed consent for additional evaluations in October 2009, the DOE had not conducted a speech-language evaluation of C.S. since 2005.

57.    The DOE did not conduct a speech-language evaluation of C.S. in connection with his 2010–2011 IEP review.

58.    The 2008 triennial evaluation did not include a vocational assessment or any other assessments designed to identify C.S.'s transition needs in the areas of education, employment, vocational training, or independent living skills.

59.    At the time Ms. Scott signed consent for additional evaluations in October 2009, the DOE had never conducted a vocational assessment for C.S., or any other assessments designed to identify his transition needs in the areas of education, employment, vocational training, or independent living skills.

60.    The DOE did not conduct a vocational assessment in connection with C.S.'s 2010–2011 IEP review, nor did it conduct any other assessments designed to identify C.S.'s transition needs in the areas of education, employment, vocational training, or independent living skills.

61.    The DOE did not conduct a psychoeducational evaluation of C.S. in connection with his 2010–2011 IEP review.

62.    The DOE did not conduct an adaptive functioning assessment of C.S. in connection with his 2010–2011 IEP review.

63.    The DOE did not conduct any assessments in connection with C.S.'s 2010–2011 IEP review which were designed to determine if C.S. exhibits mental retardation.

64.    Despite the broad consent for additional evaluations provided by Ms. Scott in October 2009, the only assessment the DOE conducted in connection with C.S.'s 2010–2011 IEP review was a one-period classroom observation.

**March 4, 2010 IEP**

65.    On March 4, 2010, the CSE convened a meeting to prepare C.S.'s IEP for the 2010–2011 school year.

66.    The individuals present at the March 4, 2010 IEP meeting were CSE psychologist Nancy Levine, CSE district representative and special education teacher Jacqueline Giurato, Linda Scott, and parent member Gloria Gonzalves.   Four members of the Cooke Center Academy staff participated in the meeting by telephone:  (1) Assistant Head of School Francis Tabone; (2) English Language Arts teacher Chaya Gray; (3) math teacher Leonard Plaia; and (4) speech teacher Virginia Trainor.

67.    The March 4, 2010 IEP designated C.S. as an eleventh-grade student for the 2010–2011 school year.

68.    The March 4, 2010 IEP recommended C.S. for placement in a 12:1:1 special class in a specialized (District 75) public school for a twelve-month school year.

69.    The March 4, 2010 IEP recommended that C.S. received as related services speech-language therapy and counseling, with each service to be provided three times per week for 45 minutes in a group of three.

70.    With respect to C.S.'s intellectual functioning, the March 4, 2010 IEP stated only that C.S.'s cognitive delays are "significant."

71.     The March 4, 2010 IEP did not indicate whether C.S. exhibits mental retardation.

72.     The March 4, 2010 IEP did not describe C.S.'s activities of daily living.

73.     The March 4, 2010 IEP did not provide for C.S. to receive any individual or small-group language instruction outside of his thrice-weekly speech-language therapy sessions.

74.     The March 4, 2010 IEP did not set forth the responsibilities of the DOE and any participating agencies for providing C.S. with transition services during the 2010–2011 school year.

75.     The March 4, 2010 IEP indicated that C.S. is expected to "live independently with support" and "be employed with support," and designated C.S.'s post-secondary placement goal as participation in "a vocational training program."

76.     The March 4, 2010 IEP did not specify what type and degree of support C.S. will need to live independently, what type of vocational training C.S. will pursue, what type and degree of support and supervision C.S. will need in the workplace, what type of vocational training should be offered to C.S. during the 2010–2011 school year, or what, if any, support Ms. Scott would be provided by the DOE or an outside agency during the 2010–2011 school year to assist in the preparation for C.S.'s transition out of high school.

**Declination of Summer Services**

77.     Because C.S.'s March 4, 2010 IEP recommended a twelve-month school year, C.S. was eligible to receive special education services during July and August 2010.

78.     Upon information and belief, the DOE affords the parents of students recommended for a twelve-month school year the choice of accepting or declining the summer services offered in the IEP.

79.     By letter to the CSE dated June 25, 2010, Ms. Scott provided written notice to the DOE that she was declining summer services for C.S. for the 2010–2011 school year.

**The DOE's Recommended Placement**

80.     By Final Notice of Recommendation ("FNR") dated June 14, 2010, the CSE informed Ms. Scott that C.S.'s recommended placement for the 2010–2011 school year was P373K @ Brooklyn Transition Center ("P373K").

81.     Ms. Scott visited P373K three times after receiving the June 14, 2010 FNR – first in June 2010, then in July 2010, and again in September 2010.

82.     The purpose of Ms. Scott's visits to P373K was to determine if the school was an appropriate placement for C.S. for September 2010.

83.     Ms. Scott initially visited P373K in mid-June 2010 and met with Sharon Williams, a P373K guidance counselor.

84.     During the June 2010 meeting, Ms. Scott presented Ms. Williams with C.S.'s March 4, 2010 IEP, and Ms. Williams retained a copy of the IEP.

85.     Ms. Williams stated that she was unable to show Ms. Scott C.S.'s proposed class for the 2010–2011 school year at the time of the June 2010 meeting.

86.     Ms. Scott made a second appointment to visit P373K on July 13, 2010 – the earliest appointment date that Ms. Williams was willing to offer.

87.     Ms. Scott also attempted to communicate with Martin Bassis, the CSE contact person listed on the June 14, 2010 FNR, to discuss C.S.'s proposed class placement at P373K.

88.     Ms. Scott faxed a letter to Mr. Bassis on June 25, 2010 that described her first visit to P373K and stated her intention to return on July 13, 2010 to see C.S.'s proposed class.

89.    Ms. Scott returned to P373K on July 13, 2010, as scheduled, and again met with Ms. Williams.

90.    When Ms. Scott arrived, Ms. Williams told her that most of the P373K students had gone swimming.

91.    Ms. Williams took Ms. Scott to a class for Autistic students, stating that this was the only class available for Ms. Scott to see.

92.    The class had one teacher, multiple paraprofessionals, and three or four students.

93.    One of the paraprofessionals, who stated that she had worked at P373K for ten years, informed Ms. Scott that students at P373K were not receiving their mandated related services.

94.    Ms. Scott observed that the students in the class were much lower functioning than C.S. and had much more limited verbal skills.

95.    Ms. Scott reminded the P373K staff that C.S. was a "12:1:1 student" pursuant to his IEP.

96.    Before leaving P373K on July 13, 2010, Ms. Scott asked to speak to the principal or an assistant principal. Ms. Scott was told that neither the principal nor the assistant principal was available to speak with her.

97.    Ms. Scott followed up on her July 13, 2010 visit by calling Ms. Williams and asking to be put in contact with an assistant principal. Ms. Scott was ultimately given the name of P373K Assistant Principal Linda Lublin-Brookoff.

98.    Ms. Scott called Ms. Lublin-Brookoff to obtain more information about C.S.'s proposed class. Ms. Lublin-Brookoff told Ms. Scott that the class she was shown on July 13, 2010 was "the class," and that she would know nothing more until September.

99.     On July 21, 2010, Ms. Scott faxed a second letter to CSE contact Martin Bassis that described her July 13, 2010 visit to P373K and asked Mr. Bassis to provide her with any information he had about C.S.'s proposed class and related services.

100.    Ms. Scott followed up on the July 21, 2010 letter by calling Mr. Bassis to discuss her concerns about P373K. Ms. Scott began calling Mr. Bassis in August 2010, but was not able to reach him until September. At that time, Ms. Scott described her concerns about P373K. Mr. Bassis responded by telling Ms. Scott that he was "only a clerk" and providing her with a contact person to request an impartial hearing.

101.    Still seeking to observe C.S.'s proposed class placement, Ms. Scott made a third appointment to visit P373K on September 17, 2010. This was the earliest appointment that Ms. Lublin-Brookoff would offer to Ms. Scott.

102.    When Ms. Scott returned to P373K on September 17, 2010, she met with Ms. Lublin-Brookoff and then with Ms. Lublin-Brookoff's administrative assistant.

103.    The administrative assistant took Ms. Scott to see C.S.'s proposed class for the 2010–2011 school year.

104.    The class Ms. Scott was shown was Class Y10.

105.    During Ms. Scott's September 17, 2010 visit, Ms. Lublin-Brookoff, her administrative assistant, and the teacher of Class Y10 all represented to Ms. Scott that Class Y10 would be C.S.'s class placement for the 2010–2011 school year.

106.    Class Y10 was a 6:1:1 class for students with Autism.

107.    Class Y10 was not a 12:1:1 class as mandated by C.S.'s March 4, 2010 IEP.

108.    When Ms. Scott observed Class Y10 on September 17, 2010, there were five students present. The classroom teacher described two of the students as nonverbal. One student

was asleep, and another student was falling asleep.  Ms. Scott inquired about these students to the teacher and was told that they were on medication.

109.    During Ms. Scott's observation, the teacher of Class Y10 was presenting a lesson on the Louisiana oil spill.  The lesson involved showing the students pictures of a dog and a bird covered in oil.  The students were asked to identify which picture showed a dog, but were unable to do so.

110.    Ms. Scott observed that the students were largely unengaged with their classmates and the paraprofessionals.

111.    Ms. Scott observed that the academic functioning level of the students in Class Y10 was very low, and that the students' social functioning level was very limited.

112.    Ms. Scott concluded that Class Y10 would not be an appropriate placement for C.S.  Ms. Scott shared that concern with the classroom teacher, stating that Class Y10 was not appropriate for C.S. and that he needed a 12:1:1 class.  Ms. Scott then went to the office at P373K and shared with Ms. Lublin-Brookoff's administrative assistant her concern that Class Y10 was not appropriate for C.S.  Ms. Scott asked the administrative assistant to convey that message to Ms. Lublin-Brookoff.

113.    No one at P373K showed Ms. Scott a 12:1:1 class for C.S.

114.    On September 23, 2010, Ms. Scott faxed a letter to CSE Chairperson Gerard Donegan that described her September 17, 2010 visit to P373K and the inappropriateness of Class Y10, and explained her conclusion that P373K was not an appropriate placement for C.S.

115.    The DOE never offered Ms. Scott any placement for C.S. other than P373K for the 2010–2011 school year.

**Reenrollment in the Cooke Center Academy**

116.    Ms. Scott reenrolled C.S. in the Cooke Center Academy for the period from September 2010 to June 2011.

117.    Ms. Scott signed an Enrollment Contract with the Cooke Center Academy on April 23, 2010 to ensure that C.S. would have a school placement for the 2010–2011 school year.

118.    The Enrollment Contract provided that the tuition rate for C.S.'s attendance at the Cooke Center Academy from September 2010 to June 2011 was $46,500.00.

119.    The Enrollment Contract, by its terms, afforded Ms. Scott the flexibility to continue working with the DOE to identify a public school placement for C.S., and to withdraw C.S. from the Cooke Center Academy without financial penalty by October 31, 2010 if the DOE offered C.S. an appropriate placement.

120.    Counsel for Ms. Scott provided the DOE with written notice of a tuition claim for C.S. on August 24, 2010 – at least ten business days before school reopened in September 2010. See ¶34 supra (setting forth IDEA's ten-day notice requirement).  The August 24, 2010 letter described the inadequacies in C.S.'s evaluations, March 4, 2010 IEP, and the DOE's recommended school placement, and stated that Ms. Scott would reenroll C.S. in the Cooke Center Academy for the 2010–2011 school year and seek payment of the tuition from the DOE.

**C.S.'s 2010–2011 Educational Program at the Cooke Center Academy**

121.    The Cooke Center Academy is a private, special education high school that served approximately 105 students with disabilities between the ages of 13 and 21 during the 2010–2011 school year.

122.    C.S. was enrolled in the Learning for Living Program at the Cooke Center Academy during the 2010–2011 school year.

123.   The Learning for Living Program is designed for students with moderate to severe cognitive and developmental disorders and deficits in social language and adaptive functioning, and offers instruction focusing on functional academic skills, critical thinking and problem solving, social skills and work ethics, emotional health, arts and media, and preparation for meaningful employment.

124.   The Learning for Living Program embraces a co-teaching, integrated related services model of instruction in which teachers and therapists work together to provide interdisciplinary instruction in the classroom.

125.   In C.S.'s program for the 2010–2011 school year, this model was implemented through two daily, 90-minute periods of interdisciplinary instruction – the Community Living block and the Daily Living block.

126.   During the Community Living block, C.S. received instruction in English Language Arts ("ELA"), social studies, and speech-language skills.  The block was co-taught by ELA teacher Ashley Gray, social studies teacher Charles LaFrance, and speech-language therapist Cindy Pearlman.

127.   During the Daily Living block, C.S. received instruction in science, counseling, and adaptive life skills.  The block was co-taught throughout the year by science teacher Katherine Lance and counselor Benjamin Yost, who were joined in succession by occupational therapist Rachel Rosenthal, teacher Jodi Messina-Nozawa, and occupational therapy assistant Omni Hornedo for the presentation of different units of instruction on adaptive life skills.

128.   The Community Living and Daily Living classes were comprised of 11 students, including C.S.  Each of the students' disabilities was an intellectual disability or Autism.

129.   All of the students in C.S.'s Community Living and Daily Living classes exhibited similar social-emotional difficulties and adaptive skills deficits, and none exhibited significant behavior problems.

130.   Learning for Living students were divided into math classes based on their independent and instructional academic levels, social-emotional functioning, language processing issues, and adaptive functioning skills.

131.   C.S. was placed in a math class with a total of four students, staffed by one head teacher and one cooperating teacher.  All of the students in C.S.'s math class were drawn from his Community Living/Daily Living blocks.

132.   The Cooke Center Academy provided C.S. with speech-language therapy and counseling services designed to address his individual needs.

133.   Cindy Pearlman, a New York State-licensed speech-language pathologist, provided C.S. with speech-language therapy during the Community Living block, and provided continual input and support to the other Cooke Center Academy staff members working with C.S. to ensure that his speech-language needs were met throughout the day.

134.   Benjamin Yost, a Licensed Master Social Worker, provided C.S. with counseling services during the Daily Living block and on a 1:1 basis as needed, and provided ongoing input and collaborative support to the other Cooke Center Academy staff members working with C.S. to ensure that his social-emotional needs were met throughout the day.

135.   The Cooke Center Academy provided C.S. with academic instruction and supportive services designed to meet his individual transition needs, including: (1) placement in a ten-hour internship program with the City of New York Parks and Recreation Department, where C.S. was able to develop real-world job skills with the support of a 1:1 community

inclusion assistant; (2) instruction by the Cooke Center Academy transitions staff in how to complete employment forms and timesheets, the submission of which allowed C.S. to receive minimum-wage payment for his internship work; (3) travel training focused on how to follow written directions, obey traffic and safety signals, and utilize the subway and bus systems; (4) a daily life skills class that addressed, inter alia, personal organization, self-care, health, and hygiene; (5) weekly trips into the community during the Community Living block designed to support the development of real-world ELA and speech-language skills; and (5) math instruction that focused on money, banking, and budgeting and that incorporated at least one additional weekly trip into the community to support the application of these adaptive math skills in a real-world setting.

136.    C.S. made meaningful progress at the Cooke Center Academy during the 2010–2011 school year.

137.    C.S.'s progress included:    (1) improved performance in math, reading comprehension, and vocabulary; (2) improved interpersonal and pragmatic language skills; (3) increased classroom participation and improved responsibility for academic work; (4) improved self-esteem and personal hygiene; and (5) improved job skills -- C.S. acquired clean-up and maintenance skills at the City of New York Parks and Recreation Department, learned the routine of work, including punctuality, appropriate attire, and following directions from a supervisor, and learned the importance of persevering even when work is difficult.

**Impartial Hearing**

138.    Ms. Scott, through counsel, filed a due process complaint on April 12, 2011.

139.    The due process complaint alleged that the DOE denied C.S. a FAPE for the 2010–2011 school year because the DOE failed to adequately evaluate C.S., failed to prepare an appropriate IEP for him, and failed to offer him an appropriate school placement.

140.    The due process complaint requested an order directing the DOE to issue direct payment for C.S.'s tuition at the Cooke Center Academy for the 2010–2011 school year, in the amount of $46,500.00, as Ms. Scott lacked the financial means to pay the tuition in advance and seek reimbursement.

141.    The case was assigned to IHO James P. Walsh.

142.    An impartial hearing was conducted before IHO Walsh on June 14, 2011, June 17, 2011, and July 12, 2011.

143.    Both the DOE and Ms. Scott were represented by legal counsel at the hearing.

144.    The DOE bore the burden of proof, including the burden of production and the burden of persuasion, on the first Burlington prong – the burden of proving that it offered C.S. a FAPE for the 2010–2011 school year. N.Y. Educ. L. § 4404(1)(c).

145.    The DOE presented the testimony of three witnesses as part of its direct case:  (1) CSE Special Education Teacher Assigned Jacqueline Giurato; (2) P373K Special Education Teacher Mark Horosky; and (3) P373K Assistant Principal Linda Lublin-Brookoff.  Ms. Giurato offered testimony regarding C.S.'s evaluations and IEP.  Mr. Horosky and Ms. Lublin-Brookoff offered testimony regarding P373K, C.S.'s recommended school placement.

146.    Neither Mr. Horosky nor Ms. Lublin-Brookoff offered any testimony describing or explaining what occurred during Ms. Scott's three visits to P373K in June, July, and September 2010, and the DOE did not attempt to defend the appropriateness of any class placement at P373K shown to Ms. Scott during those visits.

147.   Rather, the DOE presented evidence about a 12:1:1 class taught by Mr. Horosky that was never shown to Ms. Scott or offered to C.S.

148.   Mr. Horosky and Ms. Lublin-Brookoff offered conflicting testimony as to whether C.S. could have been placed in this 12:1:1 class for the 2010–2011 school year: Mr. Horosky testified that his 12:1:1 class had a full complement of twelve students within the first week of summer school in July 2010, and that C.S. could not have been placed in his class as of September 2010 because that class was exclusively for ninth- and tenth-grade students, and C.S.'s IEP designated him for placement in the eleventh grade. Ms. Lublin-Brookoff later offered contrary testimony, claiming that C.S. would have "continued" in Mr. Horosky's class in September 2010 if he had been enrolled in that class in July 2010, regardless of his IEP grade designation.

149.   Ms. Lublin-Brookoff admitted that C.S. was never offered a seat in Mr. Horosky's class. Ms. Lublin-Brookoff further admitted that she identified Mr. Horosky's class as C.S.'s placement solely for the purpose of litigation.

150.   Ms. Scott bore the burden of proof on the second Burlington prong – the burden of demonstrating that the Cooke Center Academy was an appropriate placement for C.S. N.Y. Educ. L. § 4404(1)(c).

151.   Ms. Scott testified on her own behalf and presented the testimony of seven witnesses from the Cooke Center for Learning and Development: (1) Learning for Living Program Department Chair Virginia Skar; (2) English Language Arts Teacher Ashley Gray; (3) Chairman of the Department of Mathematics and Science Kevin Allard; (4) Speech-Language Pathologist Cindy Pearlman; (5) Counselor Benjamin Yost; (6) Transition Coordinator Jillian Ma; and (7) Employee Relations Manager Timothy Toal.

152.    Ms. Scott offered testimony regarding C.S.'s special education evaluations, his March 4, 2010 IEP meeting, and her three visits to P373K in June, July, and August 2010, as well as C.S.'s placement at the Cooke Center Academy and her request for direct tuition payment.

153.    The Cooke Center for Learning and Development staff members offered testimony describing C.S.'s placement at the Cooke Center Academy for the 2010–2011 school year, the academic program and services being provided to C.S., and the progress demonstrated by C.S. over the course of the school year.

154.    Joyce Pariser, the Cooke Center for Learning and Development Vice President for Finance and Administration, appeared to testify as a DOE rebuttal witness pursuant to an order of the IHO.

155.    The DOE did not present any other rebuttal witnesses, and offered no testimonial or documentary evidence contradicting Ms. Scott's account of what occurred during her three visits to P373K during June, July, and September 2010.

**IHO Decision**

156.    On August 23, 2011, IHO Walsh issued his Findings of Fact and Decision on the merits of Ms. Scott's tuition claim for the 2010–2011 school year.

157.    The IHO ruled in favor of Ms. Scott on all three Burlington prongs and awarded her full tuition payment for C.S.'s attendance at the Cooke Center Academy for the 2010–2011 school year.

158.    With respect to the first Burlington prong, the IHO found that the DOE "failed to establish that it offered [C.S.] an appropriate placement at P373K" and thus denied C.S. a FAPE for the 2010–2011 school year.

159.    The IHO credited Mr. Horosky's testimony that C.S. would not have been a student in his class in September 2010 and "discredit[ed] the contrary testimony" of Ms. Lublin-Brookoff.

160.    The IHO did not find a denial of FAPE with respect to C.S.'s evaluations or IEP.

161.    With respect to the second Burlington prong, the IHO found that Ms. Scott satisfied her burden of proving that the Cooke Center Academy was an appropriate placement for C.S. for the 2010–2011 school year.

162.    With respect to the third Burlington prong, the IHO found that Ms. Scott demonstrated that equitable considerations favor an award of tuition payment.

163.    The IHO further found that Ms. Scott demonstrated financial inability to pay the Cooke Center Academy tuition in advance, and established her eligibility for a direct tuition payment award under Mr. and Mrs. A. ex rel. D.A. v. New York City Dep't of Educ., 769 F. Supp. 2d 403 (S.D.N.Y. 2011).

164.    The IHO ordered the DOE to issue direct payment to the Cooke Center for Learning and Development in the amount of $46,500.00 for C.S.'s tuition for the 2010–2011 school year.

### SRO Appeal

165.    By Verified Petition dated September 27, 2011, the DOE initiated an appeal of IHO Walsh's decision to the SRO.

166.    The DOE sought reversal of the IHO's decision on the following alleged grounds: (1) the DOE provided C.S. a FAPE for the 2010–2011 school year; (2) equitable considerations did not support an award of tuition payment; and (3) even if Ms. Scott satisfied all three Burlington prongs, the DOE should not be compelled to pay for C.S.'s tuition because Ms. Scott

could not afford to pay the Cooke Center Academy tuition in advance, and evidence extrinsic to the Cooke Center Academy enrollment contract suggested that the school might not take legal action to enforce the contract in the event that Ms. Scott did not prevail in her due process proceedings.

167.   The DOE did not appeal from the IHO's determination on the second Burlington prong that the Cooke Center Academy was an appropriate placement for C.S. for the 2010–2011 school year.

168.   Ms. Scott, through counsel, responded to the DOE's Verified Petition in a Verified Answer and Cross-Appeal dated October 28, 2011.  Ms. Scott asserted defenses to each of the legal claims raised in the Verified Petition and requested dismissal of the DOE's appeal. Ms. Scott cross-appealed from the IHO's decision with respect to the first Burlington prong to the extent that the IHO:  (1) found no denial of FAPE with respect to C.S.'s evaluations or IEP; and (2) failed to reach a determination as to whether P373K was a placement reasonably calculated to address C.S.'s speech-language needs.  Ms. Scott also cross-appealed from the IHO's decision with respect to the allocation of the burden of proof on the third Burlington prong and a statement made by the IHO regarding Ms. Scott's interest in the outcome of the hearing.

169.   The DOE responded to Ms. Scott's cross-appeal in a Verified Answer to the Cross-Appeal dated December 5, 2011.  The DOE requested that the cross-appeal be dismissed and that its appeal be upheld.

**SRO Decision**

170.   In Decision Number 11-123, dated January 5, 2012, SRO Justyn P. Bates sustained the DOE's appeal and dismissed Ms. Scott's cross-appeal, overturning the IHO's

decision on the first <u>Burlington</u> prong and finding that the DOE offered C.S. a FAPE for the 2010–2011 school year.

171.   The SRO found that contrary to the IHO's determination, the DOE offered C.S. an appropriate placement for the 2010–2011 school year.

172.   In so finding, the SRO reversed the IHO's credibility determination:  The SRO found that Ms. Lublin-Brookoff's testimony should be credited over that of Mr. Horosky, and that the DOE therefore "sustained its burden to establish that the assigned school [P373K] had an available special class for the student as of September 2010."

173.   The SRO further found that the DOE had no obligation to "maintain an opening in the 12:1+1 special class recommended in the student's IEP" because Ms. Scott signed the Cooke Center Academy enrollment contract in April 2010 and put the DOE on notice of a tuition claim in counsel's August 24, 2010 letter.

174.   The SRO never at any time acknowledged Ms. Scott's unrebutted testimony that the P373K staff explicitly told her that C.S.'s class placement for the 2010–2011 school year would be Class Y10 – a 6:1:1 class, or Ms. Lublin-Brookoff's admission that Mr. Horosky's 12:1:1 class was never offered to Ms. Scott and was identified as C.S.'s class placement retrospectively, solely for the purpose of litigation.

175.   In a footnote, the SRO stated that while Ms. Scott's September 17, 2010 visit to P373K "exhibits a spirit of continued cooperation and collaboration that may be relevant to an analysis of equitable considerations, it is not relevant to whether the district's recommended 2010-11 IEP offered the student a FAPE."

176.    With respect to Ms. Scott's cross-appeal, the SRO found that the DOE did not deny C.S. a FAPE with respect to any inadequacy in his evaluations, IEP, or the speech-language services offered at P373K.

177.    The SRO found that C.S.'s January 2008 psychoeducational evaluation and Vineland-II Report were timely as of the March 4, 2010 IEP meeting, and that it was "wholly irrelevant" whether those evaluations were sufficient.  The SRO premised that determination on an assertion made by DOE witness Jacqueline Giurato at the hearing that the CSE team did not have the January 2008 evaluation reports in front of it during the March 4, 2010 IEP meeting. The SRO refused to consider whether the CSE violated the IDEA by failing to consider the January 2008 evaluations because that violation was not alleged in the due process complaint.

178.    The SRO found that the DOE violated New York State and federal regulations by failing to conduct a speech-language evaluation of C.S. at least once every three years, but that this was a procedural violation that alone did not deny C.S. a FAPE.

179.    The SRO found that the DOE failed to offer C.S. sufficient speech-language instruction to comply with New York State regulations governing the education of students with Autism, but that this was a procedural violation that did not deny C.S. a FAPE.

180.    The SRO found that the DOE failed to conduct any transition or vocational assessment for C.S., but that this alone did not deny C.S. a FAPE, and that the transition plan set forth in C.S.'s March 4, 2010 IEP "provided sufficient detail to the extent that it did not result in a denial of FAPE" to C.S.

181.    The SRO never considered the cumulative impact of the DOE's multiple procedural violations, and never reached a determination as to whether those violations, considered cumulatively, resulted in a denial of FAPE.

182.     The SRO found that P373K would have met C.S.'s speech-language needs regardless of whether the school could provide C.S. with his IEP-mandated speech-language therapy sessions during the school day, or whether the school -- due to a staff shortage in speech-language therapists -- instead would have issued a Related Service Authorization compelling Ms. Scott to find an appropriate speech-language therapist and arrange for C.S. to receive speech-language therapy outside of school.

183.     The SRO never acknowledged or addressed testimony by CSE witness Jacqueline Giurato that C.S.'s IEP-mandated speech-language therapy services were to be provided in school.

184.     The SRO annulled the IHO's decision to the extent that it found that the DOE failed to offer C.S. a FAPE for the 2010–2011 school year.

185.     The SRO annulled the IHO's decision to the extent that it ordered the DOE to issue payment for C.S.'s tuition at the Cooke Center Academy for the 2010–2011 school year.

186.     The SRO instead ordered the DOE to conduct a speech-language reevaluation and a vocational assessment of C.S. in preparation for his annual review for the 2012–2013 school year -- two school years after the one at issue in the case.

187.     The SRO did not review the IHO's finding on the second Burlington prong, which had not been appealed by the DOE, and did not disturb the IHO's finding that the Cooke Center Academy was an appropriate placement for C.S.

188.     The SRO did not review the IHO's finding on the third Burlington prong and did not reach a determination as to whether equitable considerations supported Ms. Scott's tuition claim, or whether, if the three Burlington prongs were met, Ms. Scott would qualify for a direct tuition payment award under Mr. and Mrs. A.

## FIRST CAUSE OF ACTION

189.   The SRO erred in reversing the IHO's finding that the DOE denied C.S. a FAPE for the 2010–2011 school year.

190.   The IHO correctly determined that the DOE failed to demonstrate that it offered C.S. an appropriate class placement at P373K, and thus denied C.S. a FAPE for the 2010–2011 school year.

191.   The SRO improperly reversed the IHO's assessment of witness credibility, and improperly found that P373K would have offered C.S. an appropriate class placement for the 2010–2011 school year.

192.   The IHO, who experienced the testimony of the witnesses firsthand, appropriately credited the testimony of DOE witness Mark Horosky over the subsequent, contrary testimony of Linda Lublin-Brookoff and appropriately found that Mr. Horosky's 12:1:1 class at P373K was not an available placement for C.S. for September 2010. The SRO failed to accord appropriate deference to the IHO's credibility determination, mischaracterized the nature of the testimony offered by Mr. Horosky and Ms. Lublin-Brookoff, and – on a paper record – improperly determined that Ms. Lublin-Brookoff's testimony should be credited over that of Mr. Horosky.

193.   The SRO further erred in finding that the Cooke Center Academy enrollment contract and Ms. Scott's August 24, 2010 ten-day notice relieved the DOE of the obligation to offer C.S. an appropriate class placement, and that Ms. Scott's September 2010 visit to P373K was irrelevant to the issue of whether C.S. was offered a FAPE.

194.   The SRO's decision was affected by errors of law, was not supported by the evidence of record, and was not thorough and careful. The SRO's decision should not be accorded deference by this Court, and should be reversed.

## SECOND CAUSE OF ACTION

195.    The SRO erred in finding that P373K was an appropriate placement to address C.S.'s speech-language needs for the 2010–2011 school year.

196.    The SRO improperly failed to hold the DOE to the burden of proving that P373K was capable of providing C.S. with speech-language therapy consistent with his IEP mandate for the 2010–2011 school year.

197.    The SRO improperly concluded that issuance of a Related Service Authorization to Ms. Scott would have adequately satisfied the DOE's obligations under the IDEA, and adequately addressed C.S.'s speech-language needs.

198.    The SRO's decision was affected by errors of law, was not supported by the evidence of record, and was not thorough and careful.  The SRO's decision should not be accorded deference by this Court, and should be reversed.

## THIRD CAUSE OF ACTION

199.    The SRO erred in finding that the inadequacies in C.S.'s special education evaluations and IEP did not result in a denial of FAPE for the 2010–2011 school year.

200.    The SRO improperly considered the DOE's multiple procedural violations regarding C.S.'s evaluations and IEP in isolation, and failed to consider the cumulative impact of those violations with respect to the provision of FAPE.

201.    The SRO improperly refused to consider the substantive inadequacy of C.S.'s January 2008 evaluations and the CSE's stated failure to fully consider those evaluations in preparing C.S.'s IEP.

202.    Contrary to the SRO's determination, the record demonstrates that the DOE's procedural and substantive violations with respect to C.S.'s evaluations and IEP resulted in the denial of FAPE for the 2010–2011 school year.

203.    The SRO's decision was affected by errors of law, was not supported by the evidence of record, and was not thorough and careful.  The SRO's decision should not be accorded deference by this Court, and should be reversed.

## FOURTH CAUSE OF ACTION

204.    The SRO erred in annulling the IHO's award of direct payment for C.S.'s tuition at the Cooke Center Academy for the 2010–2011 school year.

205.    The IHO's tuition award was appropriate because all three Burlington prongs were satisfied:  (1) the DOE failed to offer C.S. a FAPE for the 2010–2011 school year; (2) C.S.'s placement at the Cooke Center Academy was appropriate; and (3) equitable considerations support Ms. Scott's tuition claim.

206.    The IHO's finding on the second Burlington prong – that the Cooke Center Academy was an appropriate placement for C.S. for the 2010–2011 school year – is final and binding, as the DOE did not appeal that finding to the SRO.

207.    The IHO's award of direct tuition payment was appropriate, and fully consistent with this Court's decision in Mr. and Mrs. A.

## RELIEF REQUESTED

WHEREFORE, plaintiff Linda Scott respectfully requests that the Court:

1.    Assume jurisdiction over this action;

2.    Accept additional evidence at the request of plaintiff pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.     Conduct an independent review of the administrative record and any additional evidence;

4.     Annul the decision of the SRO to the extent that it found that the DOE offered C.S. a FAPE for the 2010–2011 school year and annulled the IHO's award of direct tuition payment for C.S.'s attendance at the Cooke Center Academy for the 2010–2011 school year;

5.     Enter a judgment finding that:

    a.  The DOE failed to offer C.S. a FAPE for the 2010–2011 school year;

    b.  The IHO's finding that the Cooke Center Academy was an appropriate placement for C.S. for the 2010–2011 school year is final and binding; and

    c.  Equitable considerations support an award of direct tuition funding for C.S.'s placement at the Cooke Center Academy for the 2010–2011 school year;

6.     Issue an order directing the DOE to make direct payment to the Cooke Center Academy for C.S.'s tuition for the 2010–2011 school year, in the amount of $46,500.00;

7.     Award Ms. Scott reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and

8.     Grant such other and further relief as the Court deems just and proper.


Dated: New York, New York
       May 4, 2012

*Erin McCormack-Herbert*

ERIN MCCORMACK-HERBERT (EM 6058)
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 229
Fax: (212) 683-5544
emccormack@pfcr.org