USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA SCOTT, on behalf of and as parent and guardian of C.S., a student with a disability,

                Plaintiff,

      -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                Defendant.

12 Civ. 3558 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

      Plaintiff, Linda Scott, individually and on behalf of her child, C.S., brings this action against the New York City Department of Education (the "DOE") pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff seeks review of the January 5, 2012 decision (the "SRO Op.") of New York State Review Officer Justyn P. Bates annulling the August 23, 2011 decision (the "IHO Op.") of Impartial Hearing Officer James P. Walsh, which found the DOE's placement of C.S. substantively inappropriate and directed the DOE to pay for C.S.'s private school tuition. The parties have cross-moved for summary judgment. For the reasons stated below, Plaintiff's motion is GRANTED, and the DOE's motion is DENIED.

## STATUTORY FRAMEWORK

      "The IDEA requires New York state to 'provide disabled children with a free and appropriate public education ('FAPE').'" *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (quoting *R.E. ex rel. J.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012)). "To ensure that qualifying children receive a FAPE, [the DOE] must create an individualized education program ('IEP') for each such child." *R.E.*, 694 F.3d at 175. An IEP is a written statement that "'describes the specially designed instruction and

services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child." *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175); *see* 20 U.S.C. § 1414(d) (2012).

The DOE creates an IEP through a local Committee on Special Education (the "CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1) (2013). At a minimum, the CSE is composed of the student's parent(s), a regular or special education teacher, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician and a parent of another student with a disability. *See* N.Y. Educ. Law § 4402(1)(b)(1)(a). Together, the members of "[t]he CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 695 F.3d at 175 (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)).

The CSE does not select the specific school where the student will be placed; accordingly, the IEP does not specify a particular school site. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009). "The [DOE's] practice is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation, or FNR[,] identifying a specific school at a later date." *R.E.*, 694 F.3d at 191. Although a parent may visit the placement listed in the FNR before deciding whether to accept it, "[t]he [DOE] may select the specific school without the advice of the parent[] so long as it conforms to the program offered in the IEP." *Id.* at 191-92 (citing *T.Y.*, 584 F.3d at 420).

If a parent believes that the DOE has breached its obligations under the IDEA "by failing to provide their disabled child a FAPE, the parent may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W.*, 725 F.3d at 135 (citing

*Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993)).  If the parent lacks the financial resources necessary to front the costs of private school tuition, the parent may request direct retroactive payment to the private school.  *See Mr. & Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 427-29 (S.D.N.Y. 2011).

The process for seeking tuition reimbursement begins when a parent files a due process complaint with the DOE.  The due process complaint initiates administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO").  *See M.W.,* 725 F.3d at 135 (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).

> The three-pronged *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c), governs that hearing: (1) the DOE must establish that the student's IEP [and identified class placement, if at issue,] actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them.

*Id.* (citations and footnote omitted).  "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education."  *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379-80 (2d Cir. 2003)); *see* N.Y. Educ. Law § 4404(2).  Any party aggrieved by the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court.  *See M.W.*, 725 F.3d at 135-36; 20 U.S.C. § 1415(i)(2)(A).

## BACKGROUND

I.   C.S.'s 2010-2011 IEP and Identified Class Placement

In kindergarten, Plaintiff's son C.S. was diagnosed with autism.  From that point until C.S. completed junior high school, the DOE provided him with special education services.  Pl.'s 56.1 Statement of Material Facts ("Pl.'s 56.1") ¶¶ 4, 8.  In September 2008, Plaintiff enrolled

C.S. at the Cooke Center Academy ("CCA"), a private special education high school in Manhattan. *Id.* ¶ 9. The DOE paid C.S.'s tuition at CCA for the 2008-2009 and 2009-2010 school years. *Id.* ¶ 10.

On March 4, 2010, the CSE convened to conduct C.S.'s annual review and develop his IEP for the upcoming 2010-2011 school year. *Id.* ¶ 33; Transcript of Proceedings before Impartial Hearing Officer ("Tr.") 262. The following individuals attended the meeting: Plaintiff; Jacqueline Giurato, a special education teacher and district representative; Nancy Levine, a school psychologist and Gloria Gonzalves, the parent member. Pl.'s 56.1 ¶ 34. The following CCA staff participated in the meeting by telephone: Francis Tabone, the assistant head of CCA; Leonard Plaia, C.S.'s math teacher; Chaya Gray, C.S.'s English language arts teacher and Virginia Trainor, C.S.'s speech-language pathologist. *Id.*

In developing the IEP, the CSE relied on a sixteen-page report from CCA dated November 2009, which identified C.S.'s progress and needs in various areas, R. Ex. 5, Giurato's November 17, 2009 classroom observation report, prepared after she observed C.S.'s performance during a math lesson at CCA, R. Ex. 6, and the verbal input of Plaintiff and C.S.'s then-current teachers at CCA. Tr. 278. The CSE did not consider C.S.'s last triennial evaluation report, dated January 15, 2008, or his last speech-language evaluation from 2005. Tr. 308-11, 330; R. Ex. 7.

As a result of its March 4, 2010 meeting, the CSE issued an IEP designating C.S., who was sixteen years old, as an eleventh grader for the 2010-2011 school year. R. Ex. 3. The IEP recommended his placement in a 12:1:1 (student : teacher : paraprofessional) ratio, twelve-month special class in a specialized school and found him eligible to receive the related services of counseling, three times weekly for forty-five minutes in a group of three, and speech therapy,

4

also three times weekly for forty-five minutes in a group of three.  R. Ex. 3 at 1, 13.  In addition,

the IEP set forth C.S.'s annual goals and short-term objectives and provided for post-educational

transition services.  R. Ex. 3.

On June 14, 2010, the DOE sent a final notice of recommendation ("FNR") to Plaintiff,

which designated P373K @ Brooklyn Transition Center ("P373K") as C.S.'s public school

placement for the 2010-2011 school year.  R. Ex. 8.  Although C.S.'s IEP recommended a

twelve-month class, the DOE allows parents to accept or decline summer services.  Pl.'s 56.1 ¶

45; Def.'s Resp. to Pl.'s 56.1 Statement of Material Facts ("Def.'s Resp. 56.1") ¶ 45.  Plaintiff

had previously notified the CSE of her family's summer vacation plans at the March 4, 2010

meeting, and Plaintiff declined summer services for C.S in a letter to the CSE, dated June 25,

2010.  IHO Op. at 12; Tr. 515; R. Ex. V.

## II.   C.S.'s Identified Placement Class and Plaintiff's Unilateral Placement at CCA

In the June 25, 2010 letter, Plaintiff expressed concern about the appropriateness of

P373K following her visit to the school on June 18, 2010.  R. Ex. V.  She had met with the

school's guidance counselor, Sharon Williams, but Plaintiff was neither shown any classes nor

given specific information about the type of class C.S. would attend and the related services he

would receive.  Tr. 489-90; R. Ex. V.  Because the DOE would automatically enroll C.S. in the

recommended placement unless it received a timely response to the FNR, Plaintiff explained in

the letter that she would reserve her decision to challenge the placement until after her second

visit to the school on July 13, 2010, "the earliest date [she] could get for the appointment."  R.

Ex. V.

On July 13, 2010, Plaintiff returned to P373K and again met with Sharon Williams.  Tr.

491.  Williams showed Plaintiff a 3:1:3 class for autistic students, informing her that no other

class was available for viewing.  Tr. 492; R. Ex. W.  According to Plaintiff, a paraprofessional

told her that most students at P373K were not receiving their required services.  Tr. 495.  By

letter to the CSE dated July 20, 2010, Plaintiff reiterated her concerns about P373K, noting that

the class she was shown had an inappropriate staffing ratio and the students she had seen were

significantly more autistic than C.S.  R. Ex. W.  Plaintiff's letter also indicated that she had

spoken with the assistant principal of P373K, Linda Lublin-Brookoff, on July 16, 2010, and that

Lublin-Brookoff stated that she would be unable to provide Plaintiff with information about

C.S.'s specific class until the second week of August.  R. Ex. W.  Plaintiff's letter stated that

"before [making] a final decision" to challenge the DOE's placement, she needed to obtain

adequate information about P373K.  R. Ex. W.  When Plaintiff called Lublin-Brookoff on

August 9, 2010, Lublin-Brookoff said she could not provide Plaintiff with information until

September.  Tr. 496-98; R. Ex. Z.  The CSE did not respond to Plaintiff's letters.

Following Plaintiff's repeated, unsuccessful attempts to contact the CSE and the DOE,

including an August 12, 2010 call to the placement representative listed on the FNR, Plaintiff's

attorney informed the DOE, by letter dated August 24, 2010, that Plaintiff would reenroll C.S. in

CCA for the 2010-2011 school year and seek an order directing that the DOE pay C.S.'s tuition.

R. Ex. Y.  The letter also alleged inadequacies in the preparation of C.S.'s IEP and the

inappropriateness of P373K.

Prior to these events, Plaintiff had already signed an enrollment contract with CCA for

the 2010-2011 school year on April 23, 2010.  R. Ex. K.  Section 9(c) of the contract obligated

Plaintiff to pay tuition in the amount of $46,500 even if Plaintiff were to fail to obtain tuition

funding from the DOE.  Section 10(b), however, released Plaintiff from the contract if she were

to accept the DOE's placement and withdraw C.S. from CCA by October 31, 2010.  R. Ex. K.

Persisting in her effort to gain further information about C.S.'s proposed class at P373K, Plaintiff phoned Lublin-Brookoff on September 7, 2010.  R. Ex. Z.  Lublin-Brookoff returned the call on September 14, and they scheduled a visit for September 17, 2010.  On that day, Plaintiff "had a very short meeting" with Lublin-Brookoff, and an administrative assistant then showed Plaintiff a 6:1:1 class.  Lublin-Brookoff, the class teacher and the administrative assistant identified the 6:1:1 class as the one where C.S. would be placed.  Tr. 501.  The teacher also told Plaintiff that two of the students were nonverbal and that one student was asleep and another almost asleep due to medication.  The students appeared to Plaintiff to be functioning at significantly lower academic and social levels compared to C.S.  Tr. 502-04; R. Ex. Z.  Plaintiff told the teacher that C.S. required a 12:1:1 class and, upon leaving the school, asked the administrative assistant to convey to Lublin-Brookoff that the proposed class would be inappropriate.  Tr. 505.  Plaintiff was not shown a 12:1:1 class at P373K where C.S. could be placed.  Tr. 521-24.  By letter to the CSE dated September 23, 2010, Plaintiff recounted her multiple attempts to gain information about C.S.'s proposed class and her final conclusion that P373K would be inappropriate for C.S.  R. Ex. Z.

III.   Plaintiff's Due Process Complaint and the IHO Hearing

On April 12, 2011, Plaintiff filed a due process complaint with the DOE seeking direct payment of C.S's tuition for the 2010-2011 school year at CCA.  R. Ex. 1.  The complaint alleged that "the DOE denied C.S. a FAPE because it failed to adequately evaluate C.S., failed to prepare an appropriate IEP for him, and failed to offer him an appropriate public school placement."  Pl.'s 56.1 ¶ 106.

IHO James P. Walsh held a hearing over three nonconsecutive days from June 14 to July 12, 2011.  The DOE presented the testimony of four witnesses: Mark Horosky, a P373K special

education teacher; Linda Lublin-Brookoff, an assistant principal at P373K; Jaqueline Giurato, a

CSE special education teacher and Joyce Pariser, a CCA employee. *Id.* ¶ 111. Plaintiff testified

on her own behalf and called seven witnesses from CCA. *Id.* ¶ 112.

A portion of the testimony of Horosky and Lublin-Brookoff touched on the critical

question of which classroom C.S. would have been assigned to had he enrolled in P373K.

A. Horosky's Testimony

Mark Horosky stated that he is a certified special education teacher and has worked at

P373K for six years. Tr. 36-37. During the twelve-month 2010-2011 school year (July through

June), he taught a class with a 12:1:1 (student : teacher : paraprofessional) ratio. Tr. 40-41.

Horosky observed that "summer school is a different program from September," Tr. 127,

because "[i]t's looser," Tr. 96, and "more relaxed," Tr. 127, "[with] a shorter school day . . .

[and] more social [and] physical activities." Tr. 128. Horosky noted that some parents elect not

to enroll their child for the summer session. Tr. 44. He also explained that students entering

P373K in July 2010 were assigned to classrooms according to age, not grade, but that during the

school year, students are assigned by grade. Tr. 94-96. It was not Horosky's job, however, to

determine where to place students. Tr. 91.

According to Horosky, by the first week of July, Horosky's class had reached full

capacity with twelve students ranging in age from fifteen to seventeen years old. Tr. 45, 127.

Based on Horosky's assessment of C.S.'s academic skills using C.S.'s IEP, Horosky surmised at

the hearing that had C.S. enrolled in Horosky's class in July, "[C.S.] would have fit in my

classroom," and "[h]e would have been on top . . . [i]n both reading and math." Tr. 74. By

September, Horosky's class was composed of ninth and tenth graders exclusively and had a full

complement of twelve students. Tr. 96, 101. Because Horosky's 2010-2011 school year class

was composed exclusively of ninth and tenth graders and because students were assigned according to grade by September, Horosky agreed that C.S., as an eleventh grader, would not have been placed in Horosky's class in September 2010.  Tr. 105-06.

B.  Lublin-Brookoff's Testimony

Linda Lublin-Brookoff stated that she had served as assistant principal of P373K for six years and that she holds early childhood and special education licenses and certificates.  Tr. 441-42.  She testified that in her capacity as assistant principal, she was responsible for placing students and that placements were determined on an ungraded basis during the summer.  Tr. 442, 445.  Lublin-Brookoff stated that she would have assigned C.S. to Horosky's 12:1:1 class and that C.S. would have remained there for the 2010-2011 school year "unless there was some issue for any other reason during the summer that [she] could not predict."  Tr. 447.  Lublin-Brookoff was not asked and did not say what C.S.'s class assignment would have been had he arrived in September.  On cross-examination, Lublin-Brookoff disclosed that she made the determination of C.S.'s class placement retrospectively, after October 2010, "[w]hen it was brought to [her] attention . . . that there was a case."  Tr. 452.  When asked whether Lublin-Brookoff made C.S.'s placement determination "for the purpose of this litigation," she responded, "[c]orrect."  Tr. 452.  Lublin-Brookoff also noted that "if a student doesn't show up . . . I don't have the student's IEP, I could not tell you at that moment in July, you know.  He would have had to come here.  And at that time, when I would have seen it, I would have made the determination at that time."  Tr. 452-53.

IV.  IHO Decision

The IHO issued his decision on August 23, 2011.  First, he determined that the CSE had adequate evaluative data to prepare C.S.'s IEP.  IHO Op. at 10.  Specifically, the IHO found that

the information provided in the sixteen-page CCA progress report and the verbal input of Plaintiff and C.S.'s then-current CCA teachers at the March 4, 2010 CSE meeting was sufficient to develop the IEP.  *Id.* at 9-10.  Although the IHO observed that C.S.'s January 2008 evaluations were "less than satisfactory," the IHO found that the CSE did not rely on those evaluations.  Second, the IHO determined that C.S.'s IEP was appropriate.  *Id.* at 11.  The IHO also concluded that the IEP's recommendation of speech therapy three times weekly for forty-five minutes in a group of three, despite failing to conform to state regulatory requirements, constituted only a procedural violation that did not rise to the level of denying C.S. a FAPE.  *Id.* at 10-11.

The IHO held, however, that the DOE failed to offer C.S. an appropriate placement at P373K.  *Id.* at 13.  In arriving at this determination, the IHO cited Plaintiff's unrebutted account of events.  In particular, the IHO noted that Plaintiff had notified the CSE that C.S. would not attend the summer session, Tr. 515; R. Ex. V; IHO Op. at 12, and when Plaintiff visited the school on September 17, 2010, school staff identified a 6:1:1 class as the class where C.S. would be placed.  Tr. 501, 521-24; IHO Op. at 11.  The IHO stated that based on C.S.'s IEP and testimony by Jacqueline Giurato, the special education teacher and district representative, this 6:1:1 class would have been inappropriate for C.S.  The IHO also found that C.S. would not have been placed in Horosky's 12:1:1 class.  IHO Op. at 12.  The IHO relied on Horosky's testimony that C.S. would not have been assigned to his 12:1:1 class in September because C.S. had been designated as an eleventh grader in his IEP and, as of September, Horosky's class was full and composed of ninth and tenth graders exclusively.  Because Plaintiff had informed the CSE that C.S. would not attend the summer session, the IHO held that "the issue of whether [C.S.'s] program could have been effectively implemented by Teacher Horosky during the months of

July and August 2010 was moot." *Id.*  The IHO concluded, therefore, that the DOE failed to offer C.S. an appropriate placement at P373K, thereby denying C.S. a FAPE for the 2010-2011 school year.  IHO Op. at 13.

In explaining his reliance on Horosky's testimony, the IHO explicitly "discredit[ed] the contrary testimony provided by Witness Lublin-Brookoff (T.R. 452)."  IHO Op. at 12.  The IHO did not elaborate further on the basis for his rejection of her testimony beyond citing page 452 of the hearing transcript where Lublin-Brookoff stated that she had determined C.S.'s placement when she was first shown his IEP "in October 2010, or later" and that she made the determination "*for the purpose of this litigation.*"  Tr. 452 (emphasis added).

Having found that the DOE denied C.S. a FAPE, the IHO held that CCA was an appropriate placement for C.S. and that equitable considerations favored an award of a direct tuition payment to CCA.  IHO Op. at 14, 16.  Regarding equitable considerations, the IHO rejected the DOE's contention that Plaintiff's enrollment of C.S. in private school in April 2010 established her lack of good faith in working with the CSE because CCA's contract relieved Plaintiff of any financial obligation if she were to accept the DOE placement by October 31, 2010.  IHO Op. at 15.  The IHO also rejected the "negative connotation[]" that the DOE attributed to Plaintiff's August 24, 2010 written notice of her intent to unilaterally place C.S. because federal law required Plaintiff to reject the DOE's proposed placement "no less than ten days prior to the commencement of the school year."  IHO Op. at 15.  The IHO then found that Plaintiff lacked the financial resources to pay CCA tuition upfront and that Plaintiff, therefore, qualified for a direct retroactive payment to CCA.  IHO Op. at 16.  Accordingly, the IHO granted Plaintiff's due process complaint and directed the DOE to pay CCA $46,500.  *Id.*

V.   <u>SRO Decision</u>

On September 27, 2011, the DOE appealed the IHO's decision to the SRO on the

following grounds: (1) the DOE offered C.S. a FAPE for the 2010-2011 school year; (2)

equitable considerations did not support an award of tuition repayment; and (3) an award of

tuition repayment was inappropriate because Plaintiff was not actually liable to CCA for the cost

of tuition.  Pl.'s 56.1 ¶ 138.  The DOE did not appeal the issue of whether CCA was an

appropriate placement for C.S.  Pl.'s 56.1 ¶ 139; Def.'s Resp. 56.1 ¶ 139.

On October 28, 2011, Plaintiff sought dismissal of the DOE's appeal and cross-appealed

portions of the IHO's findings on the grounds that: (1) the DOE denied C.S. a FAPE for the

2010-2011 school year by failing to adequately evaluate him and prepare an appropriate IEP; (2)

the IHO did not determine whether P373K was a placement reasonably calculated to address

C.S.'s speech-language needs; (3) the IHO incorrectly allocated the burden of proof on Plaintiff

when considering the equities; and (4) the IHO incorrectly made a statement that CCA was the

only interested party in the outcome of the hearing.  Pl.'s 56.1 ¶¶ 140-42.

SRO Justyn P. Bates issued his decision on January 5, 2012.  The SRO agreed with the

IHO's finding that, in light of the CSE's use of the CCA progress report and the verbal input

from Plaintiff and CCA teachers at the March 4, 2010 meeting, the CSE had sufficient evaluative

data to develop C.S.'s IEP.  SRO Op. at 10.  The procedural errors involved in evaluating C.S.,

therefore, did not rise to the level of denying C.S. a FAPE.  SRO Op. at 12-16.  The SRO

declined to address the CSE's failure to consider C.S.'s January 2008 evaluations because the

issue fell outside the scope of Plaintiff's due process complaint and was not addressed below by

the IHO.  SRO Op. at 12-13.  The SRO also agreed with the IHO's finding that the IEP's failure

12

to recommend speech therapy services conformant to state regulatory requirements was a procedural error but did not constitute the denial of a FAPE.  SRO Op. at 14-15.

The SRO, however, reversed the IHO's holding that the DOE failed to offer C.S. an appropriate public school placement at P373K.  SRO Op. at 17.  The SRO relied on Lublin-Brookoff's testimony that had C.S. attended the summer session at P373K, he would have continued in Horosky's 12:1:1 class in September 2010.  SRO Op. at 18-20; Tr. 444-47.  The SRO held that "the weight of the evidence" supported Lublin-Brookoff because her testimony on the issue of C.S.'s September placement "evidenced no equivocation whatsoever," while Horosky's testimony was "at best, equivocal."  SRO Op. at 19.  The SRO credited Lublin-Brookoff because "she had the direct responsibility for placing incoming students into classrooms—not [Horosky]," and because "the hearing record does not contain any evidence that would call into question [Lublin-Brookoff's] testimony."  *Id.*  The SRO also found that the IHO had discredited Lublin-Brookoff's testimony "[w]ithout any explanation."  *Id.*  The SRO noted further that P373K's placement of students on an ungraded basis complied with state regulations.  *Id.*; *see* N.Y. Comp. Codes. R. & Regs. tit. 8, § 200.6(h)(5).  Additionally, the SRO held that the DOE "was no longer obligated to maintain an opening in the 12:1[:]1 class" for C.S. once Plaintiff had enrolled him in CCA and notified the DOE of her tuition claim in her August 24, 2010 letter.  SRO Op. at 19.

Although the SRO acknowledged that Plaintiff had visited the school in June, July and September, the SRO did not mention Plaintiff's testimony that on September 17, 2010, Plaintiff was shown a 6:1:1 class and was told by Lublin-Brookoff, the administrative assistant and the 6:1:1 class teacher that this was the class where C.S. would be placed.  The SRO held that although Plaintiff's September visit "exhibits a spirit of continued cooperation and collaboration

13

that may be relevant to the analysis of equitable considerations, it is not relevant to whether the district's recommended 2010-11 IEP offered the student a FAPE."  SRO Op. at 19 n.19.

The SRO sustained the DOE's appeal, dismissed Plaintiff's cross-appeal and annulled the IHO's decision.  *Id.* at 22.  Having concluded that the DOE met its obligation to offer C.S. a FAPE, the SRO did not consider whether CCA was an appropriate placement for C.S., whether equitable considerations favored Plaintiff's tuition claim, or whether Plaintiff qualified for a direct retroactive payment to CCA.  *Id.*

## DISCUSSION

I.  <u>Standard of Review</u>

Although the parties have sought relief from the Court by motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment."  *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)); *see also M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context, therefore, is only a 'pragmatic procedural mechanism for reviewing administrative decisions'") (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam)).  "An IDEA action, however, differs from an ordinary summary judgment motion because the existence of a disputed issue of material fact will not defeat the motion."  *J.R. v. Bd. of Educ. of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004) (citing *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003)).  Accordingly, "a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact."  *Lillbask*, 397 F.3d at 88 n.3.  Rather, "[t]he Court in such cases conducts an 'independent judicial review,'" *A.M. ex rel. Y.N. v. New York City Dep't of Educ.*,

14

12 Civ. 5573, 2013 WL 4056216, at *4 (S.D.N.Y. Aug. 9, 2013) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)), and "base[s] [its] decision[] on 'the preponderance of the evidence,'" *Grim*, 346 F.3d at 380 (citing 20 U.S.C. § 1415(i)(2)(B)).

   Although the Court is not required to base its decision on more than the preponderance of the evidence, "it must give due weight to the administrative proceedings [of the IHO and SRO], mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P.*, 554 F.3d at 252 (quoting *Gagliardo*, 489 F.3d at 113) (internal quotation marks omitted).  "Thus, [the Court] may not 'substitute [its] own notions of sound educational policy for those of the school authorities [it] review[s].'" *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)).  The Court is "not to make subjective credibility assessments[] and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who [have] heard the same evidence." *M.H.*, 685 F.3d at 240 (quoting *Grim*, 346 F.3d at 383) (internal quotation marks omitted).  In this way, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed."  *Id.* (quoting *Gagliardo*, 489 F.3d at 112) (internal quotation marks omitted); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy.").

   When, as here, the IHO and SRO reach conflicting conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy

preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO

as the final state administrative determination." *M.H.*, 685 F.3d at 246.  However,

> [T]he deference owed to an SRO's decision depends on the quality of that opinion. Reviewing courts must look to the factors that "normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."

*R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 244).  "But the district court's determination of

the persuasiveness of an administrative finding must also be colored by an acute awareness of

institutional competence and role." *M.H.*, 685 F.3d at 244.  The court should, therefore, afford

more deference to administrative findings that an IEP is substantively adequate, *id.* (citing *Cerra*,

427 F.3d at 195), and to findings "grounded in thorough and logical reasoning," *id.* (citing

*Walczak*, 142 F.3d at 129), than to determinations about whether procedure has been properly

complied with.  *Id.*  Additionally, the court should show greater deference when, as here, "its

review is based entirely on the same evidence as that before the SRO."  *Id.*  That said, if the court

"appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that

deference, and in particular where the SRO rejects a more thorough and carefully considered

decision of an IHO, it is entirely appropriate for the court" to defer to the IHO's analysis.  *Id.* at

246; *accord R.E.*, 694 F.3d at 189.

II.  <u>Issues for Review</u>

    The three-pronged *Burlington/Carter* test governs petitions for tuition reimbursement

under the IDEA.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 242-43 (2009); *see also*

*A.C.*, 553 F.3d at 171.  Under the first prong, where "the educational authority bears the burden

of proving that its IEP and recommended placement were adequate and appropriate," *C.F. ex rel.*

*R.F. v. New York City Dep't of Educ.*, 11 Civ. 00157, 2011 WL 5130101, at *7 (S.D.N.Y. Oct.

28, 2011) at *7 (citing N.Y. Educ. Law § 4404(1)(c)), *vacated and remanded*, 11-5003, 2014 WL 814884 (2d Cir. Mar. 4, 2014), "the [C]ourt conducts a review of both the procedural and substantive adequacy of the underlying decision." *A.M.*, 2013 WL 4056216, at *5 (quoting *B.O. v. Cold Spring Harbor Cent. Sch. Dist.*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011)). "At the first step, courts examine whether . . . the state has complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (quoting *Cerra*, 427 F.3d at 192) (internal quotation marks omitted). At the second step, courts examine whether the state's decision "was substantively adequate, namely, whether it was 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Rowley*, 458 U.S. at 206-07).

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (quoting *Walczak*, 142 F.3d at 129). "[H]owever, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim*, 346 F.3d at 381. A procedural violation renders an IEP inadequate only when the violation "'impeded the child's right to a FAPE,' 'significantly impeded the parents' opportunity to participate in the decision-making process,' or 'caused a deprivation of educational benefits.'" *M.W.*, 725 F.3d at 139 (quoting *R.E.*, 694 F.3d at 190); *see* 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.*, 694 F.3d at 190 (citing *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

"'A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an

17

opportunity greater than mere trivial advancement.'"  *A.C.*, 553 F.3d at 173 (quoting *Cerra*, 427 F.3d at 195).  But a school district is not required to furnish "every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199, or "everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at 132 (citation and internal quotation marks omitted).  Nonetheless, "'the door of public education must be opened in a meaningful way.'"  *M.W.*, 725 F.3d at 143 (quoting *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008)).  Like an IEP, a recommended placement may be substantively inappropriate.  *See M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 161-63 (S.D.N.Y. 2010) (holding that the student's proposed classroom was substantively inappropriate), *aff'd*, 685 F.3d 217 (2d Cir. 2012).  "Substantive inadequacy automatically entitles the parents to reimbursement."  *M.W.*, 725 F.3d at 143 (quoting *R.E.*, 694 F.3d at 190).

III.   First Prong of *Burlington/Carter*: Procedural and Substantive Adequacy

A.  Procedural Adequacy

Plaintiff alleges the following procedural violations: (1) the DOE's failure to conduct an adequate triennial evaluation, a timely speech-language reevaluation and a transitional or vocational assessment; (2) the CSE's failure to consider C.S.'s January 15, 2008 triennial evaluation report during its March 4, 2010 meeting; (3) the IEP's failure to mandate speech-language instruction compliant with then-current state regulations; and (4) the substantive denial of a FAPE arising from the cumulative impact of the foregoing procedural violations.  Pl.'s Mem. 19-22.

1.  DOE's Alleged Failure to Conduct Adequate Evaluations

Plaintiff alleges numerous procedural violations concerning the adequacy of C.S.'s evaluations.  First, Plaintiff argues that C.S.'s January 2008 evaluations were not "sufficiently

comprehensive to identify all of [C.S.'s] special education and related services needs," as required by 34 C.F.R. § 300.304(c)(6).  Pl.'s Mem. 19-20.  The IHO and SRO agreed that the January 2008 evaluations "'were less than satisfactory'" and would have ultimately provided the CSE with "'little meaningful information'" about C.S.  They also found that the CSE did not actually rely on the January 2008 evaluations in developing the IEP.  SRO Op. at 11 (quoting IHO Op. at 9).  Their findings are supported by the record.  Tr. 311, 330.  Accordingly, the Court agrees with the IHO's and SRO's conclusion that the adequacy of the January 2008 evaluations is irrelevant in determining whether the IEP was legally adequate.

Second, Plaintiff argues that the DOE's failure to conduct an updated speech-language evaluation deprived the CSE of information necessary to adequately develop the IEP.  *See* Pl.'s Mem. 21.  At the time of the CSE meeting, C.S.'s last speech-language evaluation was approximately five years old, having been conducted in 2005.  The DOE, however, must reevaluate a student every three years.  *See* 34 C.F.R. § 300.303(b)(2); *see* N.Y. Comp. Codes. R. & Regs. tit. 8, § 200.4(b)(4).  Plaintiff contends, therefore, that the IEP was legally inadequate. Plaintiff is incorrect.  Given the information provided by C.S.'s CCA speech-language pathologist, Virginia Trainor, at the March 4, 2010 meeting, the CSE had sufficient evaluative data to develop the IEP.  SRO Op. at 13-14; IHO Op. at 9-10.  Therefore, the Court agrees with the IHO's and SRO's finding that the DOE's failure to timely reevaluate C.S. in the area of speech-language amounted to a procedural violation which did not render the IEP legally inadequate.  *Cf. A.M.*, 2013 WL 4056216, at *6-8 (affirming an SRO's decision that sufficient information was available to the CSE to develop the IEP despite procedural violations).

Third, Plaintiff argues that the DOE's failure to conduct a transitional or vocational assessment of C.S. resulted in an IEP that failed to establish adequate post-educational transition

goals and strategies as required by N.Y. Comp. Codes. R. & Regs. tit 8, § 200.4(d)(2)(ix).  Pl.'s Mem. 20-21.  The IHO and SRO agreed that the CSE's reliance on the CCA progress report and input from C.S.'s then-current CCA providers overcomes this procedural deficiency.  SRO Op. at 16; IHO Op. at 10.  Their finding is supported by the record, as the IEP included annual goals, short-term objectives and recommended transition services.  R. Ex. 3.

"[W]hether a procedural or a substantive issue[,] the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *Grim*, 346 F.3d at 382.  Granting the appropriate deference to the IHO and SRO, the Court rejects Plaintiff's arguments and finds that the DOE's failure to conduct a transitional or vocational assessment did not render the IEP legally inadequate.  *Cf. M.W.*, 725 F.3d at 140 (holding that a "[f]ailure to conduct a [functional behavioral assessment] . . . does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior.").

### 2.  CSE's Failure to Consider C.S.'s January 2008 Evaluations

Plaintiff asserts that the CSE's failure to consider C.S.'s January 2008 evaluations at the CSE meeting despite the CSE's obligation to "consider . . . [the] results of the initial or most recent evaluation of the child" pursuant to 34 C.F.R. § 300.324(a)(1)(iii) renders the IEP legally inadequate.  Pl.'s Mem. 20-21.  The IHO, however, did not reach this issue, and the SRO properly declined to review it because Plaintiff did not raise it in her initial due process complaint.  SRO Op. at 12.

The IDEA provides that the party requesting a due process hearing "shall not be allowed to raise issues at the . . . hearing that were not raised in the notice . . . unless the [opposing] party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B); *see also B.P. v. New York City Dep't of Educ.*,

841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the [p]laintiffs' impartial hearing request or agreed to by [d]efendant.").  The Second Circuit has explained the importance of this requirement, noting that the IDEA affords a school district thirty days to remedy the alleged deficiencies in a party's due process complaint without penalty in order to ensure fairness for both the parents and the school district.  *See R.E.*, 694 F.3d at 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)).  If a complainant were not obligated to outline all issues in the initial due process complaint, this statutorily-established thirty day "resolution period" could not function.  *See id.* at 187 n.4.  The complainant would be permitted "to add a new claim after the resolution period has expired . . . [and could thereby] sandbag the school district."  *Id.*  More importantly, this Court's jurisdiction is statutorily limited to hearing only civil actions "with respect to the [due process] complaint presented."  20 U.S.C. § 1415(i)(2)(A).  The Second Circuit, therefore, has held that "[f]ailure to exhaust the [administrative] remedies provided in [the IDEA's] review process . . . deprives a federal court of subject-matter jurisdiction to consider the claim on appeal from the SRO."  *A.M.*, 2013 WL 4056216, at *10 (citing *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 243 (2d Cir. 2008)).

Moreover, Plaintiff's broad allegation in the due process complaint that the IEP was "not based upon adequate evaluations" is not sufficient to raise the subsidiary issue of the CSE's failure to consider the January 2008 evaluations.  Because this argument invites undermining of the "resolution period" and unfair sandbagging of the DOE, the Court rejects it.

Relying upon *M.H. v. New York City Department of Education*, Plaintiff attempts to circumvent the failure to address the issue in the initial due process complaint by arguing that the DOE "opened the door" to the issue at the hearing.  Pl.'s Opp'n 19 (citing *M.H.*, 685 F.3d at

250).  But the principles of *M.H.* cannot reasonably be extended to this case.  In *M.H.*, the DOE

raised the disputed issue "first in its opening statement, and then in the questioning of its first

witness," and "much of the testimony presented by both parties to the IHO related to the [issue]."

*M.H.*, 685 F.3d at 250.  Here, the DOE only briefly addressed the issue in its redirect

examination of its witness following Plaintiff's raising the issue on cross-examination.  Tr. 311,

330-32.  The Court holds, therefore, that the DOE did not agree to the expansion of the due

process complaint.  Accordingly, the Court lacks subject matter jurisdiction to review whether

the DOE's failure to consider C.S.'s January 2008 evaluations rendered his IEP legally

inadequate.  *E.g.*, *A.M.*, 2013 WL 4056216, at *10 (declining to extend *M.H.* for similar reasons).

       3.   Noncompliance with Regulatory Requirements for Speech-Instruction Services

Plaintiff argues that the CSE's failure to recommend speech-instruction services in the

frequency and amount required by state regulations renders the IEP legally inadequate.  Pl.'s

Mem. 17.  At the time the IEP was prepared, New York regulations required that "[i]nstructional

services . . . be provided to meet the individual language needs of a student with autism for a

minimum of 30 minutes daily in groups not to exceed two, or 60 minutes daily in groups not to

exceed six."  N.Y. Comp. Codes R. & Regs, tit. 8, § 200.13(a)(4) (amended 2010); *see also P.K.*

*ex rel. S.K. v. New York City Dep't of Educ.*, 819 F. Supp. 2d 90, 109 n.9 (E.D.N.Y. 2011)

(quoting pre-2010 regulation).  C.S.'s IEP, however, recommended speech therapy three times

weekly for 45 minutes in a group of three.  R. Ex. 3 at 13.

Plaintiff cites the Second Circuit's opinion in *T.Y. v. New York City Department of*

*Education* for the proposition that an IEP that does not contain the specific frequency and ratio

requirements set forth in section 200.13(a)(4) is *per se* legally inadequate.  584 F.3d 412.

Plaintiff is incorrect.  In *T.Y.*, the Second Circuit agreed with the IHO's conclusion that

additional speech and language services were warranted because the record showed that the "IEP did not effectively meet T.Y.'s speech and language needs," not because the IEP did not comply with the regulations. *T.Y.*, 584 F.3d at 417. In fact, the IHO in *T.Y.* stated, "I find that the level of speech and language services, although they may meet the requirements of section 200.13(a)(4), do not meet the child's needs." IHO Diane Cohen Op. at 12, *T.Y.*, 584 F.3d 412. In this case, although the IHO and SRO agreed that the IEP failed to comply with the regulation, both found that the noncompliance constituted only a procedural violation that did not rise to the level of denying C.S. a FAPE. SRO Op. at 14-15; IHO Op. at 10-11. Because the record reflects that the speech-instruction services recommended in the IEP, its noncompliance notwithstanding, were determined with the use of the CCA progress report and the input of individuals familiar with C.S.'s needs, including then-current CCA providers and Plaintiff, the Court defers to the IHO's and SRO's expertise and holdings on this issue. *See* SRO Op. at 15; IHO Op. at 11; Tr. 299, 517-19.

### 4. The Cumulative Impact of Procedural Violations

Plaintiff alleges that the foregoing procedural violations cumulatively denied C.S. a FAPE even if they individually did not. Pl.'s Mem. 22. The IHO and SRO erred in neglecting to address this issue. *E.g.*, *R.K. v. New York City Dep't of Educ.*, 09 Civ. 4478, 2011 WL 1131492, at *25 (E.D.N.Y. Jan. 21, 2011) (noting that the SRO improperly failed to consider the cumulative effect of procedural violations), *adopted*, 09 Civ. 4478, 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd*, *R.E.*, 694 F.3d 167 (2d Cir. 2012). In laying out the applicable legal standards, each administrative officer's decision neglected to recognize that a substantive denial of a FAPE may arise from the combination of individually innocuous procedural violations.

23

Their lack of direct consideration notwithstanding, the Court still finds guidance on this issue in their decisions.  The IHO and SRO agreed that these procedural violations did not render C.S.'s IEP legally inadequate for the same reason: the CSE's reliance on the CCA progress report and the input from C.S.'s then-current CCA providers resulted in an adequate IEP.  SRO Op. at 15; IHO Op. at 10.  In this instance, that rationale applies equally to the whole as it does to the parts.  The Court, therefore, holds that the DOE's procedural violations did not cumulatively deny C.S. a FAPE.

B.  Substantive Adequacy

Although the Court agrees with the SRO that C.S. received a procedurally adequate FAPE, it disagrees that C.S. received a substantively adequate one.  Plaintiff alleges that the DOE's failure to offer C.S. an adequate placement in a 12:1:1 class and P373K's inability to provide C.S. with adequate speech-instruction services constitute substantive violations and a denial of a FAPE.  The IHO concluded that the DOE did not establish that it had offered C.S. an adequate placement and therefore denied C.S. a FAPE, but the SRO reversed.  For the reasons stated below, the Court concurs with the IHO and as a result, Plaintiff satisfies the first prong under *Burlington/Carter*.

Plaintiff's chief substantive objection is that the DOE offered C.S. a placement class with a 6:1:1 (student : teacher : paraprofessional) ratio instead of a 12:1:1 ratio as required by C.S.'s IEP.  "[A] parent may challenge the adequacy of a placement classroom—even if the child never enrolled in the school—if the alleged defects were reasonably apparent to either the parent or the school district when the parent rejected the placement."  *E.A.M. v. New York City Dep't of Educ.*, 11 Civ. 3730, 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012).  After Lublin-Brookoff, the assistant principal, and two other staff members indicated to Plaintiff on September 17, 2010

during her third visit to the school that a 6:1:1 class would be C.S.'s placement class and after the

DOE had otherwise failed to respond to Plaintiff's repeated overtures to discuss her concerns,

Plaintiff, by letter dated September 23, 2010, advised the DOE of her final decision not to enroll

C.S. in P373K.  R. Ex. Z.  The IHO, crediting Plaintiff's account of the events and Horosky's

testimony that his 12:1:1 class was full and comprised of only ninth and tenth grade students in

September, found that the DOE failed to offer C.S. a FAPE.  IHO Op. at 11-13.  Upon

administrative appeal, the SRO reversed the IHO, relying on the testimony of Lublin-Brookoff—

testimony that had been rejected by the IHO as not credible—and held that C.S. would have been

placed in Horosky's 12:1:1 class.  SRO Op. at 18-19.  The SRO also found that the DOE was not

obligated to maintain an opening in the 12:1:1 class because Plaintiff had already enrolled C.S.

in CCA and notified the DOE of her tuition claim.  *Id.* at 19.  For the reasons stated below, the

Court declines to defer to the SRO's decision and adopts the IHO's well-reasoned findings on

this dispositive issue.

   1.  The SRO's Conclusions Are Not Supported by the Record

      As a preliminary matter, the SRO's decision is in large part "thorough and careful."

*Walczak*, 142 F.3d at 129 (noting the appropriateness of deference when a state officer's review

has been thorough and careful).  However, in situations when an SRO reverses the finding of an

IHO, "the court should give substantial deference to the SRO's views of educational policy, but

less to the SRO's factual findings or to its reasoning in general."  *B.R. ex rel. K.O. v. New York

City Dep't of Educ.*, 910 F. Supp. 2d 670, 675 (S.D.N.Y. 2012) (citing *M.H.*, 685 F.3d at 241);

*see also R.E.*, 694 F.3d at 189 ("a court must defer to the SRO's decision on matters requiring

educational expertise unless it concludes that the decision was inadequately reasoned, in which

case a better-reasoned IHO opinion may be considered instead.").  In this case, the SRO's

decision is inadequately reasoned and does not merit deference because the SRO: (1) failed to carefully consider significant evidence; (2) failed to address obvious weaknesses and gaps in the evidence; (3) mischaracterized the testimony of two critical witnesses; and (4) made an impermissible credibility assessment.

a)  Failure to Consider Significant Evidence

Conspicuously absent from the SRO's decision is any mention of a factual allegation critical to Plaintiff's case: when Plaintiff visited P373K on September 17, 2010, three staff members, including the assistant principal in charge of placement, told her that C.S. would be assigned to the 6:1:1 class she observed that day.  Tr. 454, 501-03, 523-24.  The SRO acknowledged the visit in a footnote, but held that it was "not relevant to whether the district[] . . . offered the student a FAPE."  SRO Op. at 19 n.19.  However, the information Plaintiff learned during her visits is highly relevant in determining whether the proposed placement was appropriate.  *See D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 950 F. Supp. 2d 494, 510 (S.D.N.Y. 2013) ("Prior to making a placement decision, a parent must have sufficient information about the proposed placement school's ability to implement the IEP to make an informed decision as to the school's adequacy.").  Indeed, on Plaintiff's three separate visits to the school, she was never shown a 12:1:1 classroom where C.S. would be assigned.  Tr. 488-92, 501, 521-24.  The DOE did not adduce any evidence to rebut Plaintiff's testimony.  *See* Def.'s Resp. 56.1 ¶¶ 52, 58-59, 68-73.  The IHO carefully considered Plaintiff's account of her September 2010 visit and all of the other evidence in the record and concluded that the DOE failed to establish that it offered C.S. an appropriate placement.  IHO Op. at 13.  The SRO, on the other hand, did not consider all of the evidence.  The SRO referred generally to Plaintiff's September 2010 visit, improperly discounting it as irrelevant.  SRO Op. at 19 n.19.  The SRO

also improperly omitted and neglected to consider Plaintiff's specific testimony that on

September 17, 2010, the 6:1:1 class was identified as C.S.'s placement class.  The SRO's

conclusion that C.S. would have been offered an adequate placement, based solely on Lublin-

Brookoff's testimony and made without consideration of Plaintiff's highly significant testimony,

is "precisely the type of determination to which courts need not defer, particularly when the

evidence has been carefully considered and found persuasive by an IHO."  *See M.H.*, 685 F.3d at

252.

   b)  Failure to Address Obvious Weaknesses and Gaps in the Evidence

        In relying exclusively on Lublin-Brookoff, the SRO not only failed to consider crucial

evidence offered by Plaintiff but also failed to recognize a critical weakness in Lublin-

Brookoff's testimony and failed to thoroughly address Horosky's testimony.  The core issue to

be resolved at the hearing was whether P373K could provide an appropriate placement class

when C.S. arrived in September 2010.  The only witness who was asked where C.S. would be

placed in the fall was Horosky.  Horosky testified that by the beginning of the regular school

year he had a full complement of twelve students (comprised only of ninth and tenth graders,

none of whom were autistic) and that had C.S. enrolled in September, he would not have been

placed in Horosky's class.  Tr. 96, 101, 105-06.  Lublin-Brookoff was not asked where C.S.

would have been assigned had he arrived in the fall.  Lublin-Brookoff was asked, "where would

[C.S.] have been sitting as of September," whereupon Lublin-Brookoff, *assuming that C.S.

would have arrived in July*, answered that C.S. "would have continued with [Horosky]."  Tr.

447.  The SRO adopted Lublin-Brookoff's testimony and rejected Horosky's, explaining that

Lublin-Brookoff "had the direct responsibility for placing incoming students into classrooms—

not [Horosky]."  SRO Op. at 19.  Lublin-Brookoff's job responsibilities, however, could not

justify the SRO's exclusive reliance on her because she offered no testimony on where C.S. would have been placed had he enrolled in September. And, even if Lublin-Brookoff had directly contradicted Horosky, it would have been incumbent upon the SRO to address Horosky's stated reasons. Under the circumstances, although Lublin-Brookoff's testimony would be entitled to be accorded the requisite weight given her responsibility for placement, Horosky's testimony would also have merited close examination because he taught the proposed class and offered details as to its size and composition as of September. The SRO's failure to acknowledge the obvious weakness of Lublin-Brookoff's testimony coupled with his failure to squarely address and distinguish Horosky's stated rationale compel the conclusion that the SRO's decision was not thorough and careful.

c) Mischaracterization of Testimony

The SRO's opinion on this issue is not entitled to deference because the testimony of two crucial witnesses was mischaracterized. First, the SRO incorrectly described Lublin-Brookoff's testimony as "evidenc[ing] no equivocation whatsoever" on the issue of C.S.'s September placement. SRO Op. at 19. Because Lublin-Brookoff was not asked where C.S. would have been placed had he arrived in September, her testimony could not "evidence[] no equivocation whatsoever" on an issue about which she was never asked. Lublin-Brookoff was only asked where C.S. would have been assigned had he arrived in July, but even during this line of questioning, Lublin-Brookoff's testimony contained several inconsistencies. At the beginning of the hearing, Lublin-Brookoff stated that C.S. "would have been placed into Mr. Horosk[y]'s class, because he was the teacher of students of that age," and that "[C.S.] would have continued with that teacher unless there was some issue for any other reason during the summer that I could not predict." Tr. 447. Moments later, Lublin-Brookoff admitted that "if a student doesn't show

up . . . I could not tell you at that moment in July, you know.  He would have had to come here.  And at that time, when I would have seen [the IEP], I would have made the determination at that time."  Tr. 452-53.  These inconsistent statements call into question the reliability of Lublin-Brookoff's testimony.  Although on direct examination she stated unequivocally that C.S. would have been assigned to Horosky's class, on cross examination she conceded that she could not have made a placement determination unless she saw C.S. and his IEP, thereby undermining her previous assertion that he would been placed in Horosky's class.

Moreover, Lublin-Brookoff's admission that the determination was made after October 2010 "for the purpose of this litigation" reveals that the testimony is retrospective and, therefore, prohibited.  *See B.R.*, 910 F. Supp. 2d at 676-78 (holding that the Second Circuit's ban in *R.E.* on retrospective testimony prohibited the IHO and SRO from relying on services that "were not raised until the impartial hearing was held").  The SRO was required to evaluate C.S.'s proposed class assignment prospectively—as of September 2010—the date when C.S. would have been placed.  Instead, the SRO relied on Lublin-Brookoff's testimony despite the fact that Lublin-Brookoff admitted that she made the placement determination "in October, 2010 or later," after Plaintiff initiated this lawsuit.  Tr. 452.

Other courts have recently rejected the use of this type of testimony to defend proposed school placements.  For example, in *D.C. ex rel. E.B. v. New York City Department of Education*, the IEP required that the student attend a seafood-free school due to his severe seafood allergy.  950 F. Supp. 2d at 500.  When the parent visited the proposed school, however, she was told that the school was not seafood free and learned about various ways in which her child might be exposed to seafood.  *Id.* at 501-02.  The school did not attempt to explain or correct these representations made to the parent after her visit.  *Id.*  However, at the impartial hearing, school

officials testified to a number of measures that they would have taken to prevent seafood

exposure.  *Id.* at 504-05.  Although the IHO and SRO both credited the school officials'

testimony, the district court reversed, explaining:

> This testimony was too little, too late. It was too little because the school was not a
> seafood free environment at the time of D.C.'s visit, and it was too late because the
> proposed methods to control the environment were only explained at the IHO
> hearing, almost a year after D.C. had to make the placement choice for her son.
> This information was never provided to D.C. and there is no evidence that, at the
> time D.C. had to make her placement decision, she had any knowledge of the
> procedures that P188 could have undertaken.

*Id.* at 512.  In this case, Plaintiff was neither shown a 12:1:1 class at P373K where C.S. could be

placed nor informed that C.S. would be in a 12:1:1 class, let alone Horosky's class.  Moreover,

on September 17, 2010, Lublin-Brookoff, the individual in charge of placement, and two

additional staff members affirmatively informed Plaintiff that C.S. would be placed in a 6:1:1

class.  Lublin-Brookoff's after-the-fact testimony is "too little, too late."

The SRO also incorrectly described Horosky's testimony as "at best, equivocal," SRO

Op. at 19, but failed to offer even one example of Horosky's alleged equivocation.  Horosky

unequivocally stated that by the first week of July and in September, his class had a full

complement of twelve students.  Tr. 101, 127.  Horosky also said that although students enrolling

in P373K during its summer session entered on an ungraded basis, his class for the regular

school year commencing in September was composed of only ninth and tenth graders.  Tr. 96,

105-06.  The IHO found Horosky's testimony to be credible and concluded that C.S. would not

have been placed in Horosky's class.  IHO Op. at 12.  Because the SRO provided no basis for

characterizing Horosky's testimony as "equivocal," the Court holds that this finding is

inadequately reasoned and does not merit deference.

d) Impermissible Credibility Determinations

The SRO based his opinion upon an impermissible credibility assessment. The IHO was present during the questioning of Lublin-Brookoff and was best situated to make a credibility determination. Although the IHO explicitly "*discredit*[*ed*] the . . . testimony provided by Witness Lublin-Brookoff," the SRO chose to jettison that assessment and credit Lublin-Brookoff, stating that "the hearing record does not contain *any* evidence that would call into question [Lublin-Brookoff's] testimony." SRO Op. at 19 (emphasis added). The hearing record does not support the SRO's finding. The IHO, having conducted the hearing and relying on his educational expertise, rejected Lublin-Brookoff's testimony as not credible given her admission regarding the timing of her placement decision. *See M.H.*, 685 F.3d at 258 ("The IHO's determination was based on his assessment of the credibility of the witnesses testifying before him . . . . It was entitled to deference on that basis."). The SRO should not have substituted his own credibility assessment for that of the IHO. *See, e.g., Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 888 (9th Cir. 2001) ("We also agree with our colleagues in the Second, Third, Fourth, and Tenth Circuits that when an SRO overturns the credibility determinations of an HO, due weight to the decision of the SRO is not warranted."); *M.V. v. Shenendehowa Cent. Sch. Dist.*, 06 Civ. 0571, 2008 WL 53181, at *4-5 (N.D.N.Y. Jan. 2, 2008) (disapproving an SRO's rejection of an IHO's credibility assessment).

The DOE contends that the IHO's use of the word "discredit" was just "inartful [sic] phrasing," that the IHO did not actually make a credibility assessment, and, therefore, the SRO only reconsidered the weight of the evidence regarding a matter of educational policy to which this Court should defer. Def.'s Mem. 11. The Court accords this argument no merit, and the cases cited by the DOE, *J.A. v. New York City Department of Education*, 10 Civ. 9056, 2012 WL

1075843 (S.D.N.Y. Mar. 28, 2012), and *S.F. v. New York City Department of Education*, 11 Civ.

870, 2011 WL 5419847 (S.D.N.Y. Nov. 9, 2011), are inapposite.  In *J.A.*, the court refused to

find that the SRO had made an impermissible credibility assessment when both the SRO *and* the

IHO credited the witnesses in question and only reconsidered the weight of  the evidence

differently between them.  2012 WL 1075843, at *9-10.  In *S.F.*, the court likewise refused to

find that the SRO had made an impermissible credibility assessment because it found that neither

the IHO nor the SRO had made any credibility determinations.  2011 WL 5419847, at *15.

Here, however, the IHO explicitly discredited Lublin-Brookoff's testimony, which the SRO then

improperly relied upon.

In sum, the SRO's opinion on this issue is insufficiently reasoned, and the Court,

therefore, defers to the well-reasoned IHO opinion.

2. Plaintiff's Claim is Prospective, Not Speculative

"The Court of course must determine the appropriateness of a placement prospectively,

without the benefit of a school year's worth of hindsight.  This, after all, is the issue the [p]arents

faced when they received the proposed IEP."  *W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch.

Dist. of New York City*, 716 F. Supp. 2d 270, 292 n.17 (S.D.N.Y. 2010) (citation omitted).  Thus,

Plaintiff may challenge C.S.'s placement as inappropriate "if the alleged defects were reasonably

apparent to either the parent or the school district when the parent rejected the placement,"

regardless of whether Plaintiff ever actually enrolled C.S. at P373K.  *E.A.M.*, 2012 WL 4571794,

at *11 (citing *W.T.*, 716 F. Supp. 2d at 292 n.17); *see also S.F.*, 2011 WL 5419847, at *14-18

(considering plaintiffs' prospective arguments about the appropriateness of a particular class

placement despite student's not having attended the school).

The DOE's contention that Plaintiff is engaged in a "strategic attempt to game the system by garnering speculation about what *might* have happened had [C.S.] attended public school" is without merit.  Def.'s Reply 1.  The IDEA contemplates prospective relief.  *See, e.g.*, *Forest Grove Sch. Dist.*, 557 U.S. at 238 ("Congress could not have intended to require parents to . . . accept an inadequate public-school education pending adjudication of their claim").  The proper inquiry for the Court, therefore, is whether the alleged defects of the placement were reasonably apparent to Plaintiff or the DOE when Plaintiff rejected P373K.  The record supports the inference that the alleged defects were reasonably apparent to both parties at that time.  The DOE staff was supplied with C.S.'s IEP stating that he required a 12:1:1 class, including Lublin-Brookoff who was the individual in charge of placing students within P373K, and the DOE staff were made aware by Plaintiff that C.S. required a 12:1:1 classroom during her visits to P373K. Additionally, Plaintiff claims that she was told by DOE staff during her September visit that C.S. would be placed in a 6:1:1 class.  Plaintiff also claims that she repeatedly attempted to contact the CSE regarding the inappropriate placement.  Tr. 521-24.  Under the circumstances of this case, the Court holds that Plaintiff's claim that C.S.'s placement class was substantively inappropriate is sufficiently prospective.  *See J.F. v. New York City Dep't of Educ.*, 12 Civ. 2184, 2013 WL 1803983, at *2 (holding that parents' challenge to placement classroom was not overly speculative in light of *R.E.*); *Cf. E.A.M.*, 2012 WL 4571794, at *11.

### 3.  The DOE Remained Obligated to Offer C.S. an Appropriate Placement

The DOE, adopting the SRO's finding on this issue, asserts that it was not obligated to maintain an appropriate placement for C.S. once Plaintiff enrolled him in CCA and notified the DOE of her intention to unilaterally place him.  *See* Def.'s Mem. 9-11.  In particular, the SRO determined:

> [T]he impartial hearing officer ignored the fact that the parent—as of April, 2010, had executed a reenrollment contract with CCA for the student's attendance during the 2010-2011 school year—and as of August 24, 2010, had rejected both the student's IEP and the assigned school, and notified the district of her intention to unilaterally place the student at CCA for the 2010-2011 school year and to seek public funding for the tuition costs.  Therefore, since neither the IDEA nor State regulations require a district to maintain a particular classroom opening for a student while the student is enrolled elsewhere in a private school, the district was no longer obligated to maintain an opening in the 12:1[:]1 special class recommended in the student's IEP.

SRO Op. at 19.  This assertion is unsupported by law or fact.

First, the Court holds that Plaintiff's declining summer services recommended in C.S.'s IEP and her signing an enrollment contract with CCA on April 23, 2010 did not release the DOE from its obligation to provide C.S. a FAPE.  The parties have already agreed that Plaintiff was not required to accept summer services as a condition for C.S.'s eligibility to receive a FAPE. Pl.'s 56.1 ¶ 45; Def.'s Resp. 56.1 ¶ 45.  And, whereas this Court may be willing to find that the DOE would be released from its obligation for the school year once a parent had firmly established a placement in private school for his or her child, Plaintiff here only secured the possibility of placing C.S. in a private school—she reserved a spot—by signing a contract with a release provision.  R. Ex. J.

In support of his conclusions, the SRO cites two of his own decisions which are inapposite.  In *Application of the Department of Education*, Appeal No. 11-015 (Mar. 31, 2011), the parents claimed that there was no space available for their child in the proposed classroom, but they did not provide any evidence to rebut the DOE's testimony to the contrary.  *Id.* at 16.  In this case, the DOE's own witness testified to a lack of space in the proposed class, and the DOE otherwise failed to establish that it could provide C.S. with an appropriate placement.  IHO Op. at 12.  In *Application of a Student with a Disability*, Appeal No. 11-008 (Mar. 7, 2011), the class profiles, not the ratios, were modified after the start of classes, and the decision did not suggest

that a student could be placed in a classroom with a different student/teacher ratio altogether.  *Id.* at 19.  Thus, the SRO failed to adequately support his conclusion that the DOE was released from its obligation to provide C.S. a FAPE because Plaintiff secured a potential private placement, and the Court holds that this obligation remained.  *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 372 (2d Cir. 2006) (stating that "a 'first bite' at failure is not required by the IDEA" and that parents of a child in a private school placement were not required to accept an inappropriate public placement prior to petitioning for reimbursement); *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 667-68 (S.D.N.Y. 2011) (analyzing school district's obligations to provide a FAPE to a private school student under New York law and concluding that the district had such a responsibility).

In reaching his decision on this issue, the SRO again overlooked the evidence in the record that explains why Plaintiff provided notice on August 24, 2010 that she would seek an impartial hearing and why the DOE's obligations were not relieved.  Although the SRO and DOE are correct that a failure to allow a parent to visit the particular placement classroom is not itself a violation, a parent's assessment of the proposed classroom remains relevant to the substantive evaluation of a FAPE.  *See S.F.*, 2011 WL 5419847, at *13 (stating that although an "inability to visit the classroom to form an opinion as to its appropriateness is not itself a *procedural* defect," a parent may "challenge whether the DOE denied the Student a FAPE as a substantive matter if the Placement Classroom cannot deliver the services determined in the IEP").  During her visits in June and July, Plaintiff was never offered the opportunity to see an appropriate classroom in order to make an assessment despite her repeated attempts to cooperate with the school district, a fact the DOE has not rebutted.  Pl's 56.1 ¶ 80; Def.'s Resp. 56.1 ¶ 80. Because of these delays, Plaintiff's August 24, 2010 letter should be construed as an effort to

comply with the law, not a waiver of responsibility for the DOE.[1]  It would be entirely contrary to the broad remedial purpose of the IDEA to deny tuition repayment to a plaintiff merely because the plaintiff took steps to preserve her rights under the IDEA after the DOE was unable to establish a proper placement prior to the commencement of the school year.  Therefore, Plaintiff's provision of written notice to the DOE on August 24, 2010 stating her concerns about P373K and her intent to seek tuition repayment did not release the DOE of its obligation under the IDEA to provide C.S. a FAPE.  Indeed, the DOE remained obligated.  *See Forest Grove Sch. Dist.*, 557 U.S. at 242 ("[C]lauses (ii) through (iv) [of § 1412(a)(10)(C)] are premised on a history of cooperation and together encourage school districts and parents to continue to cooperate in developing and implementing an appropriate IEP before resorting to unilateral private placement.")

4.   The DOE Failed to Offer C.S. an Appropriate Placement

"[T]here is no requirement in the IDEA that the IEP name a specific school location . . . . [However,] school districts [do not] have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements."  *T.Y.*, 584 F.3d at 420.  "The [DOE] may select the specific

---

[1]      20 U.S.C. § 1412(a)(10)(C)(iii)(I) provides that a federal court may reduce or deny an award of tuition repayment if:

>      (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

>      (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa)[.]

school without the advice of the parent[] so long as it conforms to the program offered in the IEP." *R.E.*, 694 F.3d at 191-92 (citing *T.Y.*, 584 F.3d at 420).

Deferring to the IHO's decision over the SRO's, the Court holds that the DOE failed to offer C.S. an appropriate placement at P373K compliant with his IEP.  The record reflects that although students enrolling in P373K during its summer session enter on an ungraded basis, only ninth and tenth grade students would have composed Horosky's 12:1:1 class for the 2010-2011 school year beginning in September.  Tr. 96, 105-06.  Consequently, as the IHO found, C.S. would not have been placed in Horosky's class.  IHO Op. at 12.  This finding is further supported by evidence in the record that Horosky's class, in any case, already had a full complement of twelve students at the beginning of September.  *Id.*; Tr. 105-06.  Moreover, it is uncontroverted in the record that right after Plaintiff met with Lublin-Brookoff on September 17, 2010, an administrative assistant showed Plaintiff a 6:1:1 class, which Lublin-Brookoff, the administrative assistant and the class's teacher all identified as C.S.'s class for the 2010-2011 school year.  Tr. 501, 523-24; *Cf. C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 11-5003, 2014 WL 814884, at *10 (2d Cir. Mar. 4, 2014) (holding that DOE's offer of a 6:1:1 placement in the IEP in spite of the "overwhelming testimony" that a 1:1 placement was necessary in part contributed to the substantive inadequacy of a FAPE).  Because the Court agrees with the IHO that Lublin-Brookoff's testimony cannot be credited, the DOE provided no evidence to demonstrate that P373K was an appropriate placement for C.S.  Consequently, in light of the record and in deference to the IHO's decision, this Court holds that the DOE failed to offer C.S. a substantively appropriate classroom and thereby denied C.S. a FAPE for the 2010-2011 school year.  Because the Court finds that P373K was a substantively inappropriate placement, the Court need not reach the issue of whether P373K could have provided substantively adequate

speech-instruction services.  Accordingly, the first prong of the *Burlington/Carter* test is resolved for Plaintiff.

IV.    Second Prong of *Burlington/Carter*: Plaintiff's Unilateral Placement

The IHO decided and the parties agree that CCA was an appropriate placement for C.S.  Pl.'s 56.1 ¶ 139; Def. 56.1 ¶ 139.  The Court has no reason to disturb their agreement.  Accordingly, Plaintiff has met her burden under both the first and second prongs of the *Burlington/Carter* test that governs petitions for tuition repayment under the IDEA.

V.    Third Prong of *Burlington/Carter*: the Equities

Although the SRO did not reach the issue, the IHO found that "equitable considerations favor an award of . . . direct payment to CCA."  IHO Op. at 16.  Plaintiff cooperated with the CSE and consistently attempted to inform it of her concerns about P373K.  She visited the school three times in order to learn anything she could about the DOE's proposed placement.  She provided timely, written notice of her intent to place C.S. at CCA and seek tuition repayment.  Although she signed an enrollment contract with CCA on April 23, 2010, Plaintiff did so only "in order to secure a place at CCA for [C.S.] in the event the [DOE] failed to offer an appropriate program."  IHO Op. at 15.

On the other hand, "[u]ncontroverted evidence shows that the DOE was less than forthcoming about the nature of [the student's] recommended placement."  *M.H.*, 712 F. Supp. 2d at 167.  In an effectively identical situation, a district court faced with similar circumstances found that equitable considerations favored plaintiffs as well:

> Upon Plaintiffs' repeated inquiries, nobody at the DOE informed Plaintiffs prior to Cruz's testimony at the Impartial Hearing that there was another classroom available for P.H. that would have been more appropriate than Washburn's. Although a FAPE does not include the right to a particular brick-and-mortar location, it does not entitle a school district to play fast-and-loose with the disabled student's placement.  Here, in response to M.H.'s repeated inquiries, the DOE

identified a particular classroom as being the one in which P.H. would have been placed. Nobody at the DOE informed Plaintiffs that there existed a classroom more appropriate than Washburn's. Only after Plaintiffs filed their impartial hearing request did the DOE take the position that the classroom it had previously identified, Washburn's, would not actually have been P.H.'s classroom. Notably, no DOE witness testified that the DOE informed M.H. prior to the impartial hearing request that P.H. would have been placed in Motta's classroom. Such conduct weighs equitably in favor of reimbursement because it reflects a disingenuous attitude toward the DOE's obligation to provide P.H. with an appropriate education in the first place.

*Id.* (internal citations omitted), *aff'd*, 685 F.3d 217 (2d Cir. 2012). In this case, the DOE similarly played "fast-and-loose" with C.S.'s proposed placement by failing to present an appropriate classroom to Plaintiff for four months and then claiming during the impartial hearing that C.S. would have been placed in a classroom that was full and potentially inappropriate given his IEP. The requirement that the DOE recommend an appropriate placement school through the FNR is meaningless if the DOE either never has to demonstrate that the proposed school contains appropriate classrooms or can determine a proposed placement months after a litigation has begun. The DOE's cavalier failure to cooperate with Plaintiff weighs equitably in favor of tuition repayment here.

The DOE argues that equitable considerations do not favor tuition repayment to Plaintiff because, much like the IHO's act of "discrediting" a witness purportedly not being a credibility assessment, Plaintiff's "contract" with CCA was not actually a contract. *See* Def.'s Reply 9-10. In support of its contention, the DOE cites testimony that the only time CCA dealt with a parent that had lost a tuition repayment claim, the school allowed the parent to satisfy her debt by providing Flamenco dancing lessons to CCA students. *See* Def.'s Mem. 25. There is no evidence in the record of such a barter arrangement with Plaintiff, who remains legally obligated to pay CCA $46,500 pursuant to section 9(c) of the enrollment contract. Thus, the Court rejects this argument as unsupported by the evidence and upholds the IHO's finding that equitable

considerations favor Plaintiff.  As such, Plaintiff has borne her burden under the first, second and third prongs of the *Burlington/Carter* test.

  C.  <u>Plaintiff is Entitled to a Direct Retroactive Payment to CCA</u>

        The SRO did not reach this issue, but the IHO found that Plaintiff qualified for direct retroactive tuition repayment to CCA.  Because her income amounted to $7,548, Plaintiff lacked the financial resources necessary to front the $46,500 tuition and then seek reimbursement.  *See Mr. & Mrs. A.*, 769 F. Supp. 2d at 427-29.  Accordingly, the Court finds Plaintiff eligible for tuition repayment in the form of a direct retroactive payment to CCA.

**CONCLUSION**

        Plaintiff has succeeded on all three prongs of the *Burlington/Carter* test.  Therefore, Plaintiff's motion for summary judgment is GRANTED, and the DOE's motion is DENIED. The Court notes, however, that it does not disturb the portions of the SRO's decision that direct the DOE to reevaluate C.S.

        By April 7, 2014, the parties shall submit a proposed judgment ordering the DOE to pay CCA the $46,500 tuition for the 2010-2011 school year.  The Clerk of Court is directed to terminate the motions at ECF Nos. 8 and 13 and to close the case.

        SO ORDERED.

Dated:  March 25, 2014
        New York, New York

                                            _____
                                                ANALISA TORRES
                                            United States District Judge

40